Summary
1/27/2016 3:49:13 PM

Differences exist between documents.

**New Document:**
14-280
50 pages (284 KB)
1/27/2016 3:49:08 PM
Used to display results.

**Old Document:**
14-280_4h25
50 pages (275 KB)
1/27/2016 3:49:08 PM

Get started: first change is on page 7.

No pages were deleted

**How to read this report**

Highlight indicates a change.
Deleted indicates deleted content.
▲ indicates pages were changed.
⬌ indicates pages were moved.

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONTGOMERY *v.* LOUISIANA

### CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 14–280.   Argued October 13, 2015—Decided January 25, 2016

Petitioner Montgomery was 17 years old in 1963, when he killed a deputy sheriff in Louisiana.  The jury returned a verdict of "guilty without capital punishment," which carried an automatic sentence of life without parole.  Nearly 50 years after Montgomery was taken into custody, this Court decided that mandatory life without parole for juvenile homicide offenders violates the Eighth Amendment's prohibition on " 'cruel and unusual punishments.' " *Miller* v. *Alabama,* 567 U. S. ___, ___.   Montgomery sought state collateral relief, arguing that *Miller* rendered his mandatory life-without-parole sentence illegal.  The trial court denied his motion, and his application for a supervisory writ was denied by the Louisiana Supreme Court, which had previously held that *Miller* does not have retroactive effect in cases on state collateral review.

*Held*:

1. This Court has jurisdiction to decide whether the Louisiana Supreme Court correctly refused to give retroactive effect to *Miller*. Pp. 5–14.

(a) *Teague* v. *Lane*, 489 U. S. 288, a federal habeas case, set forth a framework for the retroactive application of a new constitutional rule to convictions that were final when the new rule was announced. While the Court held that new constitutional rules of criminal procedure are generally not retroactive, it recognized that courts must give retroactive effect to new watershed procedural rules and to substantive rules of constitutional law.  Substantive constitutional rules include "rules forbidding criminal punishment of certain primary conduct" and "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense," *Penry* v. *Lynaugh*, 492 U. S. 302, 330.  Court-appointed *amicus* contends that because *Teague* was an interpretation of the federal habeas statute,

not a constitutional command, its retroactivity holding has no application in state collateral review proceedings.   However, neither *Teague* nor *Danforth* v. *Minnesota*, 552 U. S. 264—which concerned only *Teague*'s general retroactivity bar for new constitutional rules of criminal procedure—had occasion to address whether States are required as a constitutional matter to give retroactive effect to new substantive rules.  Pp. 5–8.

(b) When a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule.  This conclusion is established by precedents addressing the nature of substantive rules, their differences from procedural rules, and their history of retroactive application.  As *Teague, supra,* at 292, 312, and *Penry*, *supra,* at 330, indicate, substantive rules set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose.  It follows that when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful.  In contrast, where procedural error has infected a trial, a conviction or sentence may still be accurate and the defendant's continued confinement may still be lawful, see *Schriro* v. *Summerlin*, 542 U. S. 348, 352–353; for this reason, a trial conducted under a procedure found unconstitutional in a later case does not automatically invalidate a defendant's conviction or sentence.  The same possibility of a valid result does not exist where a substantive rule has eliminated a State's power to proscribe the defendant's conduct or impose a given punishment.  See *United States* v. *United States Coin & Currency*, 401 U. S. 715, 724.  By holding that new substantive rules are, indeed, retroactive, *Teague* continued a long tradition of recognizing that substantive rules must have retroactive effect regardless of when the defendant's conviction became final; for a conviction under an unconstitutional law "is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment," *Ex parte Siebold*, 100 U. S. 371, 376–377.  The same logic governs a challenge to a punishment that the Constitution deprives States of authority to impose, *Penry*, *supra*, at 330.  It follows that a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced.  This Court's precedents may not directly control the question here, but they bear on the necessary analysis, for a State that may not constitutionally insist that a prisoner remain in jail on federal habeas review may not constitutionally insist on the same result in its own postconviction proceedings.  Pp. 8–14.

2. *Miller*'s prohibition on mandatory life without parole for juvenile

offenders announced a new substantive rule that, under the Constitution, is retroactive in cases on state collateral review. The "foundation stone" for *Miller*'s analysis was the line of precedent holding certain punishments disproportionate when applied to juveniles, 567 U. S., at \_\_\_, n. 4. Relying on *Roper* v. *Simmons*, 543 U. S. 551, and *Graham* v. *Florida*, 560 U. S. 48, *Miller* recognized that children differ from adults in their "diminished culpability and greater prospects for reform," 567 U. S., at \_\_\_, and that these distinctions "diminish the penological justifications" for imposing life without parole on juvenile offenders, *id.,* at \_\_\_. Because *Miller* determined that sentencing a child to life without parole is excessive for all but " 'the rare juvenile offender whose crime reflects irreparable corruption,' " *id.,* at \_\_\_, it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—*i.e.*, juvenile offenders whose crimes reflect the transient immaturity of youth, *Penry*, 492 U. S., at 330. *Miller* therefore announced a substantive rule of constitutional law, which, like other substantive rules, is retroactive because it " 'necessarily carr[ies] a significant risk that a defendant' "—here, the vast majority of juvenile offenders—" 'faces a punishment that the law cannot impose upon him.' " *Schriro, supra,* at 352.

A State may remedy a *Miller* violation by extending parole eligibility to juvenile offenders. This would neither impose an onerous burden on the States nor disturb the finality of state convictions. And it would afford someone like Montgomery, who submits that he has evolved from a troubled, misguided youth to a model member of the prison community, the opportunity to demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change. Pp. 14–21.

2013–1163 (La. 6/20/14), 141 So. 3d 264, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–280

## HENRY MONTGOMERY, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF LOUISIANA

[January 25, 2016]

JUSTICE KENNEDY delivered the opinion of the Court.

This is another case in a series of decisions involving the sentencing of offenders who were juveniles when their crimes were committed. In *Miller* v. *Alabama*, 567 U. S. \_\_\_ (2012), the Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing. In the wake of *Miller*, the question has arisen whether its holding is retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided. Courts have reached different conclusions on this point. Compare, *e.g., Martin* v. *Symmes*, 782 F. 3d 939, 943 (CA8 2015); *Johnson* v. *Ponton*, 780 F. 3d 219, 224–226 (CA4 2015); *Chambers* v. *State*, 831 N. W. 2d 311, 331 (Minn. 2013); and *State* v. *Tate*, 2012–2763, p. 17 (La. 11/5/13), 130 So. 3d 829, 841, with *Diatchenko* v. *District Attorney for Suffolk Dist.*, 466 Mass. 655, 661–667, 1 N. E. 3d 270, 278–282 (2013); *Aiken* v. *Byars*, 410 S. C. 534, 548, 765 S. E. 2d 572, 578 (2014); *State* v. *Mares*, 2014 WY 126, ¶¶47–63, 335 P. 3d 487, 504–508; and *People* v. *Davis*, 2014 IL 115595, ¶41, 6

N. E. 3d 709, 722. Certiorari was granted in this case to resolve the question.

I

Petitioner is Henry Montgomery. In 1963, Montgomery killed Charles Hurt, a deputy sheriff in East Baton Rouge, Louisiana. Montgomery was 17 years old at the time of the crime. He was convicted of murder and sentenced to death, but the Louisiana Supreme Court reversed his conviction after finding that public prejudice had prevented a fair trial. *State* v. *Montgomery*, 181 So. 2d 756, 762 (La. 1966).

Montgomery was retried. The jury returned a verdict of "guilty without capital punishment." *State* v. *Montgomery*, 242 So. 2d 818 (La. 1970). Under Louisiana law, this verdict required the trial court to impose a sentence of life without parole. The sentence was automatic upon the jury's verdict, so Montgomery had no opportunity to present mitigation evidence to justify a less severe sentence. That evidence might have included Montgomery's young age at the time of the crime; expert testimony regarding his limited capacity for foresight, self-discipline, and judgment; and his potential for rehabilitation. Montgomery, now 69 years old, has spent almost his entire life in prison.

Almost 50 years after Montgomery was first taken into custody, this Court decided *Miller* v. *Alabama*, 567 U. S. ___. *Miller* held that mandatory life without parole for juvenile homicide offenders violates the Eighth Amendment's prohibition on "'cruel and unusual punishments.'" *Id.*, at ___ (slip op., at 2). "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," mandatory life without parole "poses too great a risk of disproportionate punishment." *Id.*, at ___ (slip op., at 17). *Miller* required that sentencing courts consider a child's "diminished culpability and heightened

capacity for change" before condemning him or her to die in prison. *Ibid.* Although *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect "'irreparable corruption.'" *Ibid.* (quoting *Roper* v. *Simmons*, 543 U. S. 551, 573 (2005)).

After this Court issued its decision in *Miller*, Montgomery sought collateral review of his mandatory life-without-parole sentence. In Louisiana there are two principal mechanisms for collateral challenge to the lawfulness of imprisonment. Each begins with a filing in the trial court where the prisoner was convicted and sentenced. La. Code Crim. Proc. Ann., Arts. 882, 926 (West 2008). The first procedure permits a prisoner to file an application for postconviction relief on one or more of seven grounds set forth in the statute. Art. 930.3. The Louisiana Supreme Court has held that none of those grounds provides a basis for collateral review of sentencing errors. See *State ex rel. Melinie* v. *State*, 93–1380 (La. 1/12/96), 665 So. 2d 1172 (*per curiam*). Sentencing errors must instead be raised through Louisiana's second collateral review procedure.

This second mechanism allows a prisoner to bring a collateral attack on his or her sentence by filing a motion to correct an illegal sentence. See Art. 882. Montgomery invoked this procedure in the East Baton Rouge Parish District Court.

The state statute provides that "[a]n illegal sentence may be corrected at any time by the court that imposed the sentence." *Ibid.* An illegal sentence "is primarily restricted to those instances in which the *term* of the prisoner's sentence is not authorized by the statute or statutes which govern the penalty" for the crime of conviction. *State* v. *Mead*, 2014–1051, p. 3 (La. App. 4 Cir. 4/22/15), 165 So. 3d 1044, 1047; see also *State* v. *Alexander*, 2014–0401 (La. 11/7/14), 152 So. 3d 137 (*per curiam*).

In the ordinary course Louisiana courts will not consider a challenge to a disproportionate sentence on collateral review; rather, as a general matter, it appears that prisoners must raise Eighth Amendment sentencing challenges on direct review. See *State* v. *Gibbs*, 620 So. 2d 296, 296–297 (La. App. 1993); *Mead*, 165 So. 3d, at 1047.

Louisiana's collateral review courts will, however, consider a motion to correct an illegal sentence based on a decision of this Court holding that the Eighth Amendment to the Federal Constitution prohibits a punishment for a type of crime or a class of offenders. When, for example, this Court held in *Graham* v. *Florida*, 560 U. S. 48 (2010), that the Eighth Amendment bars life-without-parole sentences for juvenile nonhomicide offenders, Louisiana courts heard *Graham* claims brought by prisoners whose sentences had long been final. See*, e.g.*, *State* v. *Shaffer*, 2011–1756, pp. 1–4 (La. 11/23/11), 77 So. 3d 939, 940–942 (*per curiam*) (considering motion to correct an illegal sentence on the ground that *Graham* rendered illegal a life-without-parole sentence for a juvenile nonhomicide offender). Montgomery's motion argued that *Miller* rendered his mandatory life-without-parole sentence illegal.

The trial court denied Montgomery's motion on the ground that *Miller* is not retroactive on collateral review. Montgomery then filed an application for a supervisory writ. The Louisiana Supreme Court denied the application. 2013–1163 (6/20/14), 141 So. 3d 264. The court relied on its earlier decision in *State* v. *Tate*, 2012–2763, 130 So. 3d 829, which held that *Miller* does not have retroactive effect in cases on state collateral review. Chief Justice Johnson and Justice Hughes dissented in *Tate*, and Chief Justice Johnson again noted her dissent in Montgomery's case.

This Court granted Montgomery's petition for certiorari. The petition presented the question "whether *Miller* adopts a new substantive rule that applies retroactively on

collateral review to people condemned as juveniles to die in prison." Pet. for Cert. i. In addition, the Court directed the parties to address the following question: "Do we have jurisdiction to decide whether the Supreme Court of Louisiana correctly refused to give retroactive effect in this case to our decision in *Miller*?" 575 U. S. \_\_\_ (2015).

## II

The parties agree that the Court has jurisdiction to decide this case. To ensure this conclusion is correct, the Court appointed Richard D. Bernstein as *amicus curiae* to brief and argue the position that the Court lacks jurisdiction. He has ably discharged his assigned responsibilities.

*Amicus* argues that a State is under no obligation to give a new rule of constitutional law retroactive effect in its own collateral review proceedings. As those proceedings are created by state law and under the State's plenary control, *amicus* contends, it is for state courts to define applicable principles of retroactivity. Under this view, the Louisiana Supreme Court's decision does not implicate a federal right; it only determines the scope of relief available in a particular type of state proceeding—a question of state law beyond this Court's power to review.

If, however, the Constitution establishes a rule and requires that the rule have retroactive application, then a state court's refusal to give the rule retroactive effect is reviewable by this Court. Cf. *Griffith* v. *Kentucky*, 479 U. S. 314, 328 (1987) (holding that on direct review, a new constitutional rule must be applied retroactively "to all cases, state or federal"). States may not disregard a controlling, constitutional command in their own courts. See *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 340–341, 344 (1816); see also *Yates* v. *Aiken*, 484 U. S. 211, 218 (1988) (when a State has not "placed any limit on the issues that it will entertain in collateral proceedings . . . it has a duty to grant the relief that federal law requires"). *Amicus'*

argument therefore hinges on the premise that this Court's retroactivity precedents are not a constitutional mandate.

Justice O'Connor's plurality opinion in *Teague* v. *Lane*, 489 U. S. 288 (1989), set forth a framework for retroactivity in cases on federal collateral review. Under *Teague*, a new constitutional rule of criminal procedure does not apply, as a general matter, to convictions that were final when the new rule was announced. *Teague* recognized, however, two categories of rules that are not subject to its general retroactivity bar. First, courts must give retroactive effect to new substantive rules of constitutional law. Substantive rules include "rules forbidding criminal punishment of certain primary conduct," as well as "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Penry* v. *Lynaugh*, 492 U. S. 302, 330 (1989); see also *Teague*, *supra*, at 307. Although *Teague* describes new substantive rules as an exception to the bar on retroactive application of procedural rules, this Court has recognized that substantive rules "are more accurately characterized as . . . not subject to the bar." *Schriro* v. *Summerlin*, 542 U. S. 348, 352, n. 4 (2004). Second, courts must give retroactive effect to new "'"watershed rules of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.'" *Id*., at 352; see also *Teague*, 489 U. S., at 312–313.

It is undisputed, then, that *Teague* requires the retroactive application of new substantive and watershed procedural rules in federal habeas proceedings. *Amicus*, however, contends that *Teague* was an interpretation of the federal habeas statute, not a constitutional command; and so, the argument proceeds, *Teague*'s retroactivity holding simply has no application in a State's own collateral review proceedings.

To support this claim, *amicus* points to language in

*Teague* that characterized the Court's task as "'defin[ing] the scope of the writ.'" *Id.*, at 308 (quoting *Kuhlmann* v. *Wilson*, 477 U. S. 436, 447 (1986) (plurality opinion)); see also 489 U. S., at 317 (White, J., concurring in part and concurring in judgment) ("If we are wrong in construing the reach of the habeas corpus statutes, Congress can of course correct us . . . "); *id.*, at 332 (Brennan, J., dissenting) ("No new facts or arguments have come to light suggesting that our [past] reading of the federal habeas statute . . . was plainly mistaken").

In addition, *amicus* directs us to *Danforth* v. *Minnesota*, 552 U. S. 264 (2008), in which a majority of the Court held that *Teague* does not preclude state courts from giving retroactive effect to a broader set of new constitutional rules than *Teague* itself required. 552 U. S., at 266. The *Danforth* majority concluded that *Teague*'s general rule of nonretroactivity for new constitutional rules of criminal procedure "was an exercise of this Court's power to interpret the federal habeas statute." 552 U. S., at 278. Since *Teague*'s retroactivity bar "limit[s] only the scope of *federal* habeas relief," the *Danforth* majority reasoned, States are free to make new procedural rules retroactive on state collateral review. 552 U. S., at 281–282.

*Amicus*, however, reads too much into these statements. Neither *Teague* nor *Danforth* had reason to address whether States are required as a constitutional matter to give retroactive effect to new substantive or watershed procedural rules. *Teague* originated in a federal, not state, habeas proceeding; so it had no particular reason to discuss whether any part of its holding was required by the Constitution in addition to the federal habeas statute. And *Danforth* held only that *Teague*'s general rule of nonretroactivity was an interpretation of the federal habeas statute and does not prevent States from providing greater relief in their own collateral review courts. The *Danforth* majority limited its analysis to *Teague*'s general

retroactivity bar, leaving open the question whether *Teague*'s two exceptions are binding on the States as a matter of constitutional law. 552 U. S., at 278; see also *id.*, at 277 ("[T]he case before us now does not involve either of the '*Teague* exceptions'").

In this case, the Court must address part of the question left open in *Danforth*. The Court now holds that when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule. *Teague*'s conclusion establishing the retroactivity of new substantive rules is best understood as resting upon constitutional premises. That constitutional command is, like all federal law, binding on state courts. This holding is limited to *Teague*'s first exception for substantive rules; the constitutional status of *Teague*'s exception for watershed rules of procedure need not be addressed here.

This Court's precedents addressing the nature of substantive rules, their differences from procedural rules, and their history of retroactive application establish that the Constitution requires substantive rules to have retroactive effect regardless of when a conviction became final.

The category of substantive rules discussed in *Teague* originated in Justice Harlan's approach to retroactivity. *Teague* adopted that reasoning. See 489 U. S., at 292, 312 (discussing *Mackey* v. *United States*, 401 U. S. 667, 692 (1971) (opinion concurring in judgments in part and dissenting in part); and *Desist* v. *United States*, 394 U. S. 244, 261, n. 2 (1969) (Harlan, J., dissenting)). Justice Harlan defined substantive constitutional rules as "those that place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Mackey*, *supra*, at 692. In *Penry* v. *Lynaugh*, decided four months after *Teague*, the Court recognized that "the first exception set forth in *Teague* should be understood to

cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." 492 U. S., at 330. *Penry* explained that Justice Harlan's first exception spoke "in terms of substantive categorical guarantees accorded by the Constitution, regardless of the procedures followed." *Id.,* at 329. Whether a new rule bars States from proscribing certain conduct or from inflicting a certain punishment, "[i]n both cases, the Constitution itself deprives the State of the power to impose a certain penalty." *Id.,* at 330.

Substantive rules, then, set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose. It follows that when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful. Procedural rules, in contrast, are designed to enhance the accuracy of a conviction or sentence by regulating "the *manner of determining* the defendant's culpability." *Schriro*, 542 U. S., at 353; *Teague, supra*, at 313. Those rules "merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Schriro, supra*, at 352. Even where procedural error has infected a trial, the resulting conviction or sentence may still be accurate; and, by extension, the defendant's continued confinement may still be lawful. For this reason, a trial conducted under a procedure found to be unconstitutional in a later case does not, as a general matter, have the automatic consequence of invalidating a defendant's conviction or sentence.

The same possibility of a valid result does not exist where a substantive rule has eliminated a State's power to proscribe the defendant's conduct or impose a given punishment. "[E]ven the use of impeccable factfinding proce-

dures could not legitimate a verdict" where "the conduct being penalized is constitutionally immune from punishment." *United States* v. *United States Coin & Currency*, 401 U. S. 715, 724 (1971). Nor could the use of flawless sentencing procedures legitimate a punishment where the Constitution immunizes the defendant from the sentence imposed. "No circumstances call more for the invocation of a rule of complete retroactivity." *Ibid.*

By holding that new substantive rules are, indeed, retroactive, *Teague* continued a long tradition of giving retroactive effect to constitutional rights that go beyond procedural guarantees. See *Mackey*, *supra*, at 692–693 (opinion of Harlan, J.) ("[T]he writ has historically been available for attacking convictions on [substantive] grounds"). Before *Brown* v. *Allen*, 344 U. S. 443 (1953), "federal courts would never consider the merits of a constitutional claim if the habeas petitioner had a fair opportunity to raise his arguments in the original proceeding." *Desist*, 394 U. S., at 261 (Harlan, J., dissenting). Even in the pre-1953 era of restricted federal habeas, however, an exception was made "when the habeas petitioner attacked the constitutionality of the state statute under which he had been convicted. Since, in this situation, the State had no power to proscribe the conduct for which the petitioner was imprisoned, it could not constitutionally insist that he remain in jail." *Id.*, at 261, n. 2 (Harlan, J., dissenting) (citation omitted).

In *Ex parte Siebold*, 100 U. S. 371 (1880), the Court addressed why substantive rules must have retroactive effect regardless of when the defendant's conviction became final. At the time of that decision, "[m]ere error in the judgment or proceedings, under and by virtue of which a party is imprisoned, constitute[d] no ground for the issue of the writ." *Id.*, at 375. Before *Siebold*, the law might have been thought to establish that so long as the conviction and sentence were imposed by a court of competent

jurisdiction, no habeas relief could issue. In *Siebold*, however, the petitioners attacked the judgments on the ground that they had been convicted under unconstitutional statutes. The Court explained that if "this position is well taken, it affects the foundation of the whole proceedings." *Id.*, at 376. A conviction under an unconstitutional law

> "is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment. It is true, if no writ of error lies, the judgment may be final, in the sense that there may be no means of reversing it. But . . . if the laws are unconstitutional and void, the Circuit Court acquired no jurisdiction of the causes." *Id.*, at 376–377.

As discussed, the Court has concluded that the same logic governs a challenge to a punishment that the Constitution deprives States of authority to impose. *Penry, supra*, at 330; see also Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 151 (1970) ("Broadly speaking, the original sphere for collateral attack on a conviction was where the tribunal lacked jurisdiction either in the usual sense or because the statute under which the defendant had been prosecuted was unconstitutional or because the sentence was one the court could not lawfully impose" (footnotes omitted)). A conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void. See *Siebold*, 100 U. S., at 376. It follows, as a general principle, that a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced.

*Siebold* and the other cases discussed in this opinion, of course, do not directly control the question the Court now answers for the first time. These precedents did not in-

volve a state court's postconviction review of a conviction
or sentence and so did not address whether the Constitu-
tion requires new substantive rules to have retroactive
effect in cases on state collateral review. These decisions,
however, have important bearing on the analysis neces-
sary in this case.

In support of its holding that a conviction obtained
under an unconstitutional law warrants habeas relief, the
*Siebold* Court explained that "[a]n unconstitutional law is
void, and is as no law." *Ibid.* A penalty imposed pursuant
to an unconstitutional law is no less void because the
prisoner's sentence became final before the law was held
unconstitutional. There is no grandfather clause that
permits States to enforce punishments the Constitution
forbids. To conclude otherwise would undercut the Consti-
tution's substantive guarantees. Writing for the Court in
*United States Coin & Currency*, Justice Harlan made this
point when he declared that "[n]o circumstances call more
for the invocation of a rule of complete retroactivity" than
when "the conduct being penalized is constitutionally
immune from punishment." 401 U. S., at 724. *United
States Coin & Currency* involved a case on direct review;
yet, for the reasons explained in this opinion, the same
principle should govern the application of substantive
rules on collateral review. As Justice Harlan explained,
where a State lacked the power to proscribe the habeas
petitioner's conduct, "it could not constitutionally insist
that he remain in jail." *Desist*, *supra*, at 261, n. 2 (dissent-
ing opinion).

If a State may not constitutionally insist that a prisoner
remain in jail on federal habeas review, it may not consti-
tutionally insist on the same result in its own postconvic-
tion proceedings. Under the Supremacy Clause of the
Constitution, state collateral review courts have no greater
power than federal habeas courts to mandate that a
prisoner continue to suffer punishment barred by the

Constitution. If a state collateral proceeding is open to a claim controlled by federal law, the state court "has a duty to grant the relief that federal law requires." *Yates*, 484 U. S., at 218. Where state collateral review proceedings permit prisoners to challenge the lawfulness of their confinement, States cannot refuse to give retroactive effect to a substantive constitutional right that determines the outcome of that challenge.

As a final point, it must be noted that the retroactive application of substantive rules does not implicate a State's weighty interests in ensuring the finality of convictions and sentences. *Teague* warned against the intrusiveness of "*continually* forc[ing] the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." 489 U. S., at 310. This concern has no application in the realm of substantive rules, for no resources marshaled by a State could preserve a conviction or sentence that the Constitution deprives the State of power to impose. See *Mackey*, 401 U. S., at 693 (opinion of Harlan, J.) ("There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose").

In adjudicating claims under its collateral review procedures a State may not deny a controlling right asserted under the Constitution, assuming the claim is properly presented in the case. Louisiana follows these basic Supremacy Clause principles in its postconviction proceedings for challenging the legality of a sentence. The State's collateral review procedures are open to claims that a decision of this Court has rendered certain sentences illegal, as a substantive matter, under the Eighth Amendment. See, *e.g., State* v. *Dyer*, 2011–1758, pp. 1–2 (La. 11/23/11), 77 So. 3d 928, 928–929 (*per curiam*) (considering claim on collateral review that this Court's decision in *Graham* v. *Florida*, 560 U. S. 48, rendered peti-

tioner's life-without-parole sentence illegal).  Montgomery alleges that *Miller* announced a substantive constitutional rule and that the Louisiana Supreme Court erred by failing to recognize its retroactive effect.  This Court has jurisdiction to review that determination.

## III

This leads to the question whether *Miller*'s prohibition on mandatory life without parole for juvenile offenders indeed did announce a new substantive rule that, under the Constitution, must be retroactive.

As stated above, a procedural rule "regulate[s] only the *manner of determining* the defendant's culpability." *Schriro*, 542 U. S., at 353.  A substantive rule, in contrast, forbids "criminal punishment of certain primary conduct" or prohibits "a certain category of punishment for a class of defendants because of their status or offense."  *Penry*, 492 U. S., at 330; see also *Schriro*, *supra*, at 353 (A substantive rule "alters the range of conduct or the class of persons that the law punishes").  Under this standard, and for the reasons explained below, *Miller* announced a substantive rule that is retroactive in cases on collateral review.

The "foundation stone" for *Miller*'s analysis was this Court's line of precedent holding certain punishments disproportionate when applied to juveniles.  567 U. S., at ___, n. 4 (slip op., at 8, n. 4).  Those cases include *Graham* v. *Florida*, *supra*, which held that the Eighth Amendment bars life without parole for juvenile nonhomicide offenders, and *Roper* v. *Simmons*, 543 U. S. 551, which held that the Eighth Amendment prohibits capital punishment for those under the age of 18 at the time of their crimes.  Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the manner of determining a defendant's sentence.  See *Graham*, *supra*, at 59 ("The concept of

proportionality is central to the Eighth Amendment"); see also *Weems* v. *United States*, 217 U. S. 349, 367 (1910); *Harmelin* v. *Michigan*, 501 U. S. 957, 997–998 (1991) (KENNEDY, J., concurring in part and concurring in judgment).

*Miller* took as its starting premise the principle established in *Roper* and *Graham* that "children are constitutionally different from adults for purposes of sentencing." 567 U. S., at \_\_\_ (slip op., at 8) (citing *Roper*, *supra*, at 569–570; and *Graham*, *supra*, at 68). These differences result from children's "diminished culpability and greater prospects for reform," and are apparent in three primary ways:

> "First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking. Second, children 'are more vulnerable to negative influences and outside pressures,' including from their family and peers; they have limited 'control over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievable depravity.'" 567 U. S., at \_\_\_ (slip op., at 8) (quoting *Roper, supra*, at 569–570; alterations, citations, and some internal quotation marks omitted).

As a corollary to a child's lesser culpability, *Miller* recognized that "the distinctive attributes of youth diminish the penological justifications" for imposing life without parole on juvenile offenders. 567 U. S., at \_\_\_ (slip op., at 9). Because retribution "relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult." *Ibid.* (quoting *Graham, supra*, at 71; internal quotation marks omitted). The deterrence

rationale likewise does not suffice, since "the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment."  567 U. S., at ___–___ (slip op., at 9–10) (internal quotation marks omitted).  The need for incapacitation is lessened, too, because ordinary adolescent development diminishes the likelihood that a juvenile offender "'forever will be a danger to society.'"  *Id.,* at ___ (slip op., at 10) (quoting *Graham*, 560 U. S., at 72).  Rehabilitation is not a satisfactory rationale, either.  Rehabilitation cannot justify the sentence, as life without parole "forswears altogether the rehabilitative ideal."  567 U. S., at ___ (slip op., at 10) (quoting *Graham*, *supra*, at 74).

These considerations underlay the Court's holding in *Miller* that mandatory life-without-parole sentences for children "pos[e] too great a risk of disproportionate punishment."  567 U. S., at ___ (slip op., at 17).  *Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  *Ibid.*  The Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified.  But in light of "children's diminished culpability and heightened capacity for change," *Miller* made clear that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."  *Ibid.*

*Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth."  *Id.,* at ___ (slip op., at 9).  Even if a court considers a child's age before sentencing him or her

to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "'unfortunate yet transient immaturity.'" *Id.*, at \_\_\_ (slip op., at 17) (quoting *Roper*, 543 U. S., at 573). Because *Miller* determined that sentencing a child to life without parole is excessive for all but "'the rare juvenile offender whose crime reflects irreparable corruption,'" 567 U. S., at \_\_\_ (slip op., at 17) (quoting *Roper*, *supra*, at 573), it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. *Penry*, 492 U. S., at 330. As a result, *Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive because it "'necessarily carr[ies] a significant risk that a defendant'"—here, the vast majority of juvenile offenders— "'faces a punishment that the law cannot impose upon him.'" *Schriro*, 542 U. S., at 352 (quoting *Bousley* v. *United States*, 523 U. S. 614, 620 (1998)).

Louisiana nonetheless argues that *Miller* is procedural because it did not place any punishment beyond the State's power to impose; it instead required sentencing courts to take children's age into account before condemning them to die in prison. In support of this argument, Louisiana points to *Miller*'s statement that the decision "does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller*, *supra*, at \_\_\_ (slip op., at 20). *Miller*, it is true, did not bar a punishment for all juvenile offenders, as the Court did in *Roper* or *Graham*. *Miller* did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. For that reason, *Miller* is no less substan-

tive than are *Roper* and *Graham*. Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole. After *Miller*, it will be the rare juvenile offender who can receive that same sentence. The only difference between *Roper* and *Graham*, on the one hand, and *Miller*, on the other hand, is that *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption. The fact that life without parole could be a proportionate sentence for the latter kind of juvenile offender does not mean that all other children imprisoned under a disproportionate sentence have not suffered the deprivation of a substantive right.

To be sure, *Miller*'s holding has a procedural component. *Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence. See 567 U. S., at ___ (slip op., at 20). Louisiana contends that because *Miller* requires this process, it must have set forth a procedural rule. This argument, however, conflates a procedural requirement necessary to implement a substantive guarantee with a rule that "regulate[s] only the *manner of determining* the defendant's culpability." *Schriro, supra*, at 353. There are instances in which a substantive change in the law must be attended by a procedure that enables a prisoner to show that he falls within the category of persons whom the law may no longer punish. See *Mackey*, 401 U. S., at 692, n. 7 (opinion of Harlan, J.) ("Some rules may have both procedural and substantive ramifications, as I have used those terms here"). For example, when an element of a criminal offense is deemed unconstitutional, a prisoner convicted under that offense receives a new trial where the government must prove the prisoner's conduct still fits within the modified definition of the crime. In a similar vein, when the Constitution prohibits a particular form of punishment

for a class of persons, an affected prisoner receives a procedure through which he can show that he belongs to the protected class. See, *e.g.*, *Atkins* v. *Virginia*, 536 U. S. 304, 317 (2002) (requiring a procedure to determine whether a particular individual with an intellectual disability "fall[s] within the range of [intellectually disabled] offenders about whom there is a national consensus" that execution is impermissible). Those procedural requirements do not, of course, transform substantive rules into procedural ones.

The procedure *Miller* prescribes is no different. A hearing where "youth and its attendant characteristics" are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. 567 U. S., at \_\_\_ (slip op., at 1). The hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.

Louisiana suggests that *Miller* cannot have made a constitutional distinction between children whose crimes reflect transient immaturity and those whose crimes reflect irreparable corruption because *Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility. That this finding is not required, however, speaks only to the degree of procedure *Miller* mandated in order to implement its substantive guarantee. When a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems. See *Ford* v. *Wainwright*, 477 U. S. 399, 416–417 (1986) ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences"). Fidelity to this important principle of federalism,

however, should not be construed to demean the substantive character of the federal right at issue. That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment.

For this reason, the death penalty cases Louisiana cites in support of its position are inapposite. See, *e.g., Beard* v. *Banks*, 542 U. S. 406, 408 (2004) (holding nonretroactive the rule that forbids instructing a jury to disregard mitigating factors not found by a unanimous vote); *O'Dell* v. *Netherland*, 521 U. S. 151, 153 (1997) (holding nonretroactive the rule providing that, if the prosecutor cites future dangerousness, the defendant may inform the jury of his ineligibility for parole); *Sawyer* v. *Smith*, 497 U. S. 227, 229 (1990) (holding nonretroactive the rule that forbids suggesting to a capital jury that it is not responsible for a death sentence). Those decisions altered the processes in which States must engage before sentencing a person to death. The processes may have had some effect on the likelihood that capital punishment would be imposed, but none of those decisions rendered a certain penalty unconstitutionally excessive for a category of offenders.

The Court now holds that *Miller* announced a substantive rule of constitutional law. The conclusion that *Miller* states a substantive rule comports with the principles that informed *Teague*. *Teague* sought to balance the important goals of finality and comity with the liberty interests of those imprisoned pursuant to rules later deemed unconstitutional. *Miller*'s conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution.

Giving *Miller* retroactive effect, moreover, does not require States to relitigate sentences, let alone convic-

tions, in every case where a juvenile offender received mandatory life without parole. A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. See, *e.g.,* Wyo. Stat. Ann. §6–10–301(c) (2013) (juvenile homicide offenders eligible for parole after 25 years). Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment.

Extending parole eligibility to juvenile offenders does not impose an onerous burden on the States, nor does it disturb the finality of state convictions. Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change.

Petitioner has discussed in his submissions to this Court his evolution from a troubled, misguided youth to a model member of the prison community. Petitioner states that he helped establish an inmate boxing team, of which he later became a trainer and coach. He alleges that he has contributed his time and labor to the prison's silkscreen department and that he strives to offer advice and serve as a role model to other inmates. These claims have not been tested or even addressed by the State, so the Court does not confirm their accuracy. The petitioner's submissions are relevant, however, as an example of one kind of evidence that prisoners might use to demonstrate rehabilitation.

*          *          *

Henry Montgomery has spent each day of the past 46 years knowing he was condemned to die in prison. Per-

haps it can be established that, due to exceptional circumstances, this fate was a just and proportionate punishment for the crime he committed as a 17-year-old boy. In light of what this Court has said in *Roper*, *Graham*, and *Miller* about how children are constitutionally different from adults in their level of culpability, however, prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored.

The judgment of the Supreme Court of Louisiana is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 14–280

———————

## HENRY MONTGOMERY, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[January 25, 2016]

JUSTICE SCALIA, with whom JUSTICE THOMAS and
JUSTICE ALITO join, dissenting.

The Court has no jurisdiction to decide this case, and
the decision it arrives at is wrong.  I respectfully dissent.

### I. Jurisdiction

Louisiana postconviction courts willingly entertain
Eighth Amendment claims but, with limited exceptions,
apply the law as it existed when the state prisoner was
convicted and sentenced.  Shortly after this Court an-
nounced *Teague* v. *Lane*, 489 U. S. 288 (1989), the Louisi-
ana Supreme Court adopted *Teague*'s framework to govern
the provision of postconviction remedies available to *state*
prisoners in its *state* courts as a matter of *state* law.  *Tay-
lor* v. *Whitley*, 606 So. 2d 1292 (1992).  In doing so, the
court stated that it was "not bound" to adopt that federal
framework.  *Id.,* at 1296.  One would think, then, that it is
none of our business that a 69-year-old Louisiana prison-
er's state-law motion to be resentenced according to *Miller*
v. *Alabama*, 567 U. S. \_\_\_ (2012), a case announced almost
half a century after his sentence was final, was met with a
firm rejection on state-law grounds by the Louisiana
Supreme Court.  But a majority of this Court, eager to
reach the merits of this case, resolves the question of our
jurisdiction by deciding that the Constitution *requires*
state postconviction courts to adopt *Teague*'s exception for

so-called "substantive" new rules and to provide state-law remedies for the violations of those rules to prisoners whose sentences long ago became final. This conscription into federal service of state postconviction courts is nothing short of astonishing.

## A

*Teague* announced that federal courts could not grant habeas corpus to overturn state convictions on the basis of a "new rule" of constitutional law—meaning one announced after the convictions became final—*unless* that new rule was a "substantive rule" or a "watershed rul[e] of criminal procedure." 489 U. S., at 311. The *Teague* prescription followed from Justice Harlan's view of the "retroactivity problem" detailed in his separate opinion in *Desist* v. *United States*, 394 U. S. 244, 256 (1969) (dissenting opinion), and later in *Mackey* v. *United States*, 401 U. S. 667, 675 (1971) (opinion concurring in judgment in part and dissenting in part). Placing the rule's first exception in context requires more analysis than the majority has applied.

The Court in the mid-20th century was confounded by what Justice Harlan called the "swift pace of constitutional change," *Pickelsimer* v. *Wainwright*, 375 U. S. 2, 4 (1963) (dissenting opinion), as it vacated and remanded many cases in the wake of *Gideon* v. *Wainwright*, 372 U. S. 335 (1963). Justice Harlan called upon the Court to engage in "informed and deliberate consideration" of "whether the States are constitutionally required to apply [*Gideon*'s] new rule retrospectively, which may well require the reopening of cases long since finally adjudicated in accordance with then applicable decisions of this Court." *Pickelsimer, supra,* at 3. The Court answered that call in *Linkletter* v. *Walker*, 381 U. S. 618 (1965). *Linkletter* began with the premise "that we are neither required to apply, nor prohibited from applying, a decision

retrospectively" and went on to adopt an equitable rule-by-rule approach to retroactivity, considering "the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Id.,* at 629.

The *Linkletter* framework proved unworkable when the Court began applying the rule-by-rule approach not only to cases on collateral review but also to cases on direct review, rejecting any distinction "between convictions now final" and "convictions at various stages of trial and direct review." *Stovall* v. *Denno*, 388 U. S. 293, 300 (1967). It was this rejection that drew Justice Harlan's reproach in *Desist* and later in *Mackey*. He urged that "all 'new' rules of constitutional law must, at a minimum, be applied to all those cases which are still subject to direct review by this Court at the time the 'new' decision is handed down." *Desist, supra*, at 258 (dissenting opinion). "Simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from th[e] model of judicial review." *Mackey*, *supra,* at 679.

The decision in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), heeded this constitutional concern. The Court jettisoned the *Linkletter* test for cases pending on direct review and adopted for them Justice Harlan's rule of redressability: "[F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of *constitutional* adjudication." 479 U. S., at 322 (emphasis added). We established in *Griffith* that this Court must play by our own "old rules"—rules we have settled before the defendant's conviction and sentence become final, even those that are a "clear break from existing precedent"—for cases pending before us on direct appeal. *Id.,* at 323. Since the *Griffith* rule is constitution-

ally compelled, we instructed the lower state and federal courts to comply with it as well. *Ibid.*

When *Teague* followed on *Griffith*'s heels two years later, the opinion contained no discussion of "basic norms of constitutional adjudication," *Griffith*, *supra,* at 322, nor any discussion of the obligations of state courts. Doing away with *Linkletter* for good, the Court adopted Justice Harlan's solution to "the retroactivity problem" for cases pending on collateral review—which he described not as a constitutional problem but as "a problem as to the *scope of the habeas writ.*" *Mackey*, *supra*, at 684 (emphasis added). *Teague* held that federal habeas courts could no longer upset state-court convictions for violations of so-called "new rules," not yet announced when the conviction became final. 489 U. S., at 310. But it allowed for the previously mentioned exceptions to this rule of nonredressability: substantive rules placing "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" and "watershed rules of criminal procedure." *Id.*, at 311. Then in *Penry* v. *Lynaugh*, 492 U. S. 302 (1989), the Court expanded this first exception for substantive rules to embrace new rules "prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Id.,* at 330.

Neither *Teague* nor its exceptions are constitutionally compelled. Unlike today's majority, the *Teague*-era Court understood that cases on collateral review are fundamentally different from those pending on direct review because of "considerations of finality in the judicial process." *Shea* v. *Louisiana,* 470 U. S. 51, 59–60 (1985). That line of finality demarcating the constitutionally required rule in *Griffith* from the habeas rule in *Teague* supplies the answer to the not-so-difficult question whether a state post-conviction court must remedy the violation of a new substantive rule: No. A state court need only apply the law as it existed at the time a defendant's conviction and sen-

tence became final. See *Griffith*, *supra,* at 322. And once final, "a new rule cannot reopen a door already closed." *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529, 541 (1991) (opinion of Souter, J.). Any relief a prisoner might receive in a state court after finality is a matter of grace, not constitutional prescription.

## B

The majority can marshal no case support for its contrary position. It creates a constitutional rule where none had been before: "*Teague*'s conclusion establishing the retroactivity of new substantive rules is best understood as resting upon constitutional premises" binding in both federal and state courts. *Ante,* at 8. "Best understood." Because of what? Surely not because of its history and derivation.

Because of the Supremacy Clause, says the majority. *Ante,* at 12. But the Supremacy Clause cannot possibly answer the question before us here. It only elicits another question: What federal law is supreme? Old or new? The majority's champion, Justice Harlan, said the old rules apply for federal habeas review of a state-court conviction: "[T]he habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place," *Desist,* 394 U. S., at 263 (dissenting opinion), for a state court cannot "toe the constitutional mark" that does not yet exist, *Mackey*, 401 U. S., at 687 (opinion of Harlan, J.). Following his analysis, we have clarified time and again—recently in *Greene* v. *Fisher*, 565 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 4–5)—that *federal* habeas courts are to review state-court decisions against the law and factual record that existed at the time the decisions were made. "Section 2254(d)(1) [of the federal habeas statute] refers, in the past tense, to a state-court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law.

This backward-looking language requires an examination of the state-court decision at the time it was made." *Cullen* v. *Pinholster*, 563 U. S. 170, 181–182 (2011). How can it possibly be, then, that the Constitution requires a *state* court's review of its own convictions to be governed by "new rules" rather than (what suffices when federal courts review state courts) "old rules"?

The majority relies on the statement in *United States* v. *United States Coin & Currency*, 401 U. S. 715 (1971), that "'[n]o circumstances call more for the invocation of a rule of complete retroactivity'" than when "'the conduct being penalized is constitutionally immune from punishment.'" *Ante,* at 9–10 (quoting 401 U. S., at 724). The majority neglects to mention that this statement was addressing the "circumstances" of a conviction that "had *not become final*," *id*., at 724, n. 13 (emphasis added), when the "rule of complete retroactivity" was invoked. *Coin & Currency*, an opinion written by (guess whom?) Justice Harlan, merely foreshadowed the rule announced in *Griffith*, that all cases pending on direct review receive the benefit of newly announced rules—better termed "old rules" for such rules were announced *before* finality.

The majority also misappropriates *Yates* v. *Aiken*, 484 U. S. 211 (1988), which reviewed a state habeas petitioner's Fourteenth Amendment claim that the jury instructions at his trial lessened the State's burden to prove every element of his offense beyond a reasonable doubt. That case at least did involve a conviction that was final. But the majority is oblivious to the critical fact that Yates's claim depended upon an *old rule*, settled at the time of his trial. *Id.,* at 217. This Court reversed the state habeas court for its refusal to consider that the jury instructions violated that *old rule*. *Ibid*. The majority places great weight upon the dictum in *Yates* that the South Carolina habeas court "'ha[d] a duty to grant the relief that federal law requires.'" *Ante,* at 13 (quoting *Yates*, *supra*, at 218).

It is simply wrong to divorce that dictum from the facts it addressed. In that context, *Yates* merely reinforces the line drawn by *Griffith*: when state courts provide a forum for postconviction relief, they need to play by the "old rules" announced *before* the date on which a defendant's conviction and sentence became final.

The other sleight of hand performed by the majority is its emphasis on *Ex parte Siebold*, 100 U. S. 371 (1880). That case considered a petition for a federal writ of habeas corpus following a federal conviction, and the initial issue it confronted was its jurisdiction. A federal court has no inherent habeas corpus power, *Ex parte Bollman*, 4 Cranch 75, 94 (1807), but only that which is conferred (and limited) by statute, see, *e.g., Felker* v. *Turpin*, 518 U. S. 651, 664 (1996). As *Siebold* stated, it was forbidden to use the federal habeas writ "as a mere writ of error." 100 U. S., at 375. "The only ground on which this court, or any court, without some special statute authorizing it, [could] give relief on *habeas corpus* to a prisoner under conviction and sentence of another court is the want of jurisdiction in such court over the person or the cause, or some other matter rendering its proceedings void." *Ibid.* Turning to the facts before it, the Court decided it was within its power to hear Siebold's claim, which did not merely protest that the conviction and sentence were "erroneous" but contended that the statute he was convicted of violating was unconstitutional and the conviction therefore void: "[I]f the laws are unconstitutional and void, the Circuit Court acquired no jurisdiction of the causes." *Id.,* at 376–377. *Siebold* is thus a decision that expands the limits of this Court's power to issue a federal habeas writ for a federal prisoner.

The majority, however, divines from *Siebold* "a general principle" that "a court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became

final before the rule was announced." *Ante*, at 11. That is utterly impossible. No "general principle" can rationally be derived from *Siebold* about constitutionally required remedies in state courts; indeed, the opinion does not even speak to constitutionally required remedies in *federal* courts. It is a decision about this Court's statutory power to grant the Original Writ, not about its constitutional obligation to do so. Nowhere in *Siebold* did this Court intimate that relief was constitutionally required—or as the majority puts it, that a court would have had "no authority" to leave in place Siebold's conviction, *ante,* at 11.

The majority's sorry acknowledgment that "*Siebold* and the other cases discussed in this opinion, of course, do not directly control the question the Court now answers for the first time," *ibid.*, is not nearly enough of a disclaimer. It is not just that they "do not directly control," but that the dicta cherry picked from those cases are irrelevant; they addressed circumstances fundamentally different from those to which the majority now applies them. Indeed, we know for sure that the author of some of those dicta, Justice Harlan, held views that flatly contradict the majority.

The majority's maxim that "state collateral review courts have no greater power than federal habeas courts to mandate that a prisoner continue to suffer punishment barred by the Constitution," *ante,* at 12–13, begs the question rather than contributes to its solution. Until today, no federal court was *constitutionally obliged* to grant relief for the past violation of a newly announced substantive rule. Until today, it was Congress's prerogative to do away with *Teague*'s exceptions altogether. Indeed, we had left unresolved the question whether Congress had already done that when it amended a section of the habeas corpus statute to add backward-looking language governing the review of state-court decisions. See Antiterrorism

and Effective Death Penalty Act of 1996, §104, 110 Stat. 1219, codified at 28 U. S. C. §2254(d)(1); *Greene,* 565 U. S, at \_\_\_, n. (slip op., at 5, n.). A maxim shown to be more relevant to this case, by the analysis that the majority omitted, is this: The Supremacy Clause does not impose upon state courts a constitutional obligation it fails to impose upon federal courts.

## C

All that remains to support the majority's conclusion is that all-purpose Latin canon: *ipse dixit*. The majority opines that because a substantive rule eliminates a State's power to proscribe certain conduct or impose a certain punishment, it has "the automatic consequence of invalidating a defendant's conviction or sentence." *Ante,* at 9. What provision of the Constitution could conceivably produce such a result? The Due Process Clause? It surely cannot be a denial of due process for a court to pronounce a final judgment which, though fully in accord with federal constitutional law at the time, fails to anticipate a change to be made by this Court half a century into the future. The Equal Protection Clause? Both statutory and (increasingly) constitutional laws change. If it were a denial of equal protection to hold an earlier defendant to a law more stringent than what exists today, it would also be a denial of equal protection to hold a later defendant to a law more stringent than what existed 50 years ago. No principle of equal protection requires the criminal law of all ages to be the same.

The majority grandly asserts that "[t]here is no grandfather clause that permits States to *enforce punishments the Constitution forbids*." *Ante*, at 12 (emphasis added). Of course the italicized phrase begs the question. There most certainly is a grandfather clause—one we have called *finality*—which says that the Constitution does not require States to revise punishments that were lawful when

they were imposed. Once a conviction has become final, whether new rules or old ones will be applied to revisit the conviction is a matter entirely within the State's control; the Constitution has nothing to say about that choice. The majority says that there is no "possibility of a valid result" when a new substantive rule is not applied retroactively. *Ante*, at 9. But the whole controversy here arises because many think there *is* a valid result when a defendant has been convicted under the law that existed when his conviction became final. And the States are unquestionably entitled to take that view of things.

The majority's imposition of *Teague*'s first exception upon the States is all the worse because it does not adhere to that exception as initially conceived by Justice Harlan— an exception for rules that "place, as a matter of constitutional interpretation, certain kinds of primary, private individual *conduct* beyond the power of the criminal lawmaking authority to proscribe." *Mackey*, 401 U. S., at 692 (emphasis added). Rather, it endorses the exception as expanded by *Penry*, to include "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." 492 U. S., at 330. That expansion empowered and obligated federal (and after today state) habeas courts to invoke this Court's Eighth Amendment "evolving standards of decency" jurisprudence to upset punishments that were constitutional when imposed but are "cruel and unusual," U. S. Const., Amdt. 8, in our newly enlightened society. See *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958). The "evolving standards" test concedes that in 1969 the State had the power to punish Henry Montgomery as it did. Indeed, Montgomery could at that time have been sentenced to death by our yet unevolved society. Even 20 years later, this Court reaffirmed that the Constitution posed no bar to death sentences for juveniles. *Stanford* v. *Kentucky*, 492 U. S. 361 (1989). Not until our People's "standards of decency"

evolved a mere 10 years ago—nearly 40 years after Mont-gomery's sentence was imposed—did this Court declare the death penalty unconstitutional for juveniles. *Roper* v. *Simmons*, 543 U. S. 551 (2005). Even then, the Court reassured States that "the punishment of life imprison-ment without the possibility of parole is itself a severe sanction," implicitly still available for juveniles. *Id.*, at 572. And again five years ago this Court left in place this severe sanction for juvenile homicide offenders. *Graham* v. *Florida*, 560 U. S. 48, 69 (2010). So for the five decades Montgomery has spent in prison, not one of this Court's precedents called into question the legality of his sen-tence—until the People's "standards of decency," as per-ceived by five Justices, "evolved" yet again in *Miller*.

*Teague*'s central purpose was to do away with the old regime's tendency to "*continually* force the States to mar-shal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitu-tional standards." 489 U. S., at 310. Today's holding thwarts that purpose with a vengeance. Our ever-evolving Constitution changes the rules of "cruel and unusual punishments" every few years. In the passage from *Mackey* that the majority's opinion quotes, *ante,* at 13, Justice Harlan noted the diminishing force of finality (and hence the equitable propriety—not the constitutional requirement—of disregarding it) when the law punishes nonpunishable *conduct*, see 401 U. S., at 693. But one cannot imagine a clearer frustration of the sensible policy of *Teague* when the ever-moving target of impermissible *punishments* is at issue. Today's holding not only fore-closes Congress from eliminating this expansion of *Teague* in federal courts, but also foists this distortion upon the States.

## II. The Retroactivity of *Miller*

Having created jurisdiction by ripping *Teague*'s first

exception from its moorings, converting an equitable rule governing federal habeas relief to a constitutional command governing state courts as well, the majority proceeds to the merits. And here it confronts a second obstacle to its desired outcome. *Miller*, the opinion it wishes to impose upon state postconviction courts, simply does not decree what the first part of the majority's opinion says *Teague*'s first exception requires to be given retroactive effect: a rule "set[ting] forth *categorical* constitutional guarantees that place certain criminal laws and punishments *altogether* beyond the State's power to impose." *Ante*, at 9 (emphasis added). No problem. Having distorted *Teague*, the majority simply proceeds to rewrite *Miller*.

The majority asserts that *Miller* "rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Ante,* at 17. It insists that *Miller* barred life-without-parole sentences "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. For that reason, *Miller* is no less substantive than are *Roper* and *Graham*." *Ante,* at 17–18. The problem is that *Miller* stated, quite clearly, precisely the opposite: "Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer *follow a certain process*—considering an offender's youth and attendant characteristics—before imposing a particular penalty." 567 U. S., at ___ (slip op., at 20) (emphasis added).

To contradict that clear statement, the majority opinion quotes passages from *Miller* that assert such things as "mandatory life-without-parole sentences for children 'pos[e] too great a risk of disproportionate punishment'" and "'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.'" *Ante*, at 16

(quoting *Miller*, *supra*, at ___ (slip op., at 17)).  But to say that a punishment might be inappropriate and disproportionate for certain juvenile offenders is not to say that it is unconstitutionally void.  All of the statements relied on by the majority do nothing more than express the *reason* why the new, youth-protective *procedure* prescribed by *Miller* is desirable: to deter life sentences for certain juvenile offenders.  On the issue of whether *Miller* rendered life-without-parole penalties unconstitutional, it is impossible to get past *Miller*'s unambiguous statement that "[o]ur decision does not categorically bar a penalty for a class of offenders" and "mandates only that a sentencer follow a certain process . . . before imposing a particular penalty." 567 U. S., at ___ (slip op., at 20).  It is plain as day that the majority is not applying *Miller*, but rewriting it.[1]

And the rewriting has consequences beyond merely making *Miller*'s procedural guarantee retroactive.  If, indeed, a State is categorically prohibited from imposing life without parole on juvenile offenders whose crimes do not "reflect permanent incorrigibility," then even when the procedures that *Miller* demands are provided the constitutional requirement is not necessarily satisfied.  It remains available for the defendant sentenced to life without parole to argue that his crimes did not in fact "reflect permanent incorrigibility."  Or as the majority's opinion puts it: "That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child[2]

––––––––

[1] It is amusing that the majority's initial description of *Miller* is the same as our own: "[T]he Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing." *Ante*, at 1.  Only 15 pages later, after softening the reader with 3 pages of obfuscating analysis, does the majority dare to attribute to *Miller* that which *Miller* explicitly denies.

[2] The majority presumably regards any person one day short of voting age as a "child."

whose crime reflects transient immaturity to life without parole.  To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Ante*, at 20.

How wonderful.  Federal and (like it or not) state judges are henceforth to resolve the knotty "legal" question: whether a 17-year-old who murdered an innocent sheriff's deputy half a century ago was at the time of his trial "incorrigible."  Under *Miller*, bear in mind, the inquiry is whether the inmate was seen to be incorrigible when he was sentenced—not whether he has proven corrigible and so can safely be paroled today.  What silliness.  (And how impossible in practice, see Brief for National District Attorneys Assn. et al. as *Amici Curiae* 9–17.)  When in *Lockett* v. *Ohio*, 438 U. S. 586, 608 (1978), the Court imposed the thitherto unheard-of requirement that the sentencer in capital cases must consider and weigh all "relevant mitigating factors," it at least did not impose the substantive (and hence judicially reviewable) requirement that the aggravators must outweigh the mitigators; it would suffice that the sentencer *thought* so.  And, fairly read, *Miller* did the same.  Not so with the "incorrigibility" requirement that the Court imposes today to make *Miller* retroactive.

But have no fear.  The majority does not seriously expect state and federal collateral-review tribunals to engage in this silliness, probing the evidence of "incorrigibility" that existed decades ago when defendants were sentenced.  What the majority expects (and intends) to happen is set forth in the following not-so-subtle invitation: "A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."  *Ante*, at 21.  Of course.  This whole exercise, this whole distortion of *Miller*, is just a devious way of eliminating life without parole for juvenile offenders.  The Court might have done that

expressly (as we know, the Court can decree *anything*), but that would have been something of an embarrassment. After all, one of the justifications the Court gave for decreeing an end to the death penalty for murders (no matter how many) committed by a juvenile was that life without parole was a severe enough punishment. See *Roper*, 543 U. S., at 572. How could the majority—in an opinion written by the very author of *Roper*—now say *that* punishment is *also* unconstitutional? The Court expressly refused to say so in *Miller*. 567 U. S., at \_\_\_ (slip op., at 17). So the Court refuses again today, but merely makes imposition of that severe sanction a practical impossibility. And then, in Godfather fashion, the majority makes state legislatures an offer they can't refuse: Avoid all the utterly impossible nonsense we have prescribed by simply "permitting juvenile homicide offenders to be considered for parole." *Ante,* at 21. Mission accomplished.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–280

_____

## HENRY MONTGOMERY, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[January 25, 2016]

JUSTICE THOMAS, dissenting.

I join JUSTICE SCALIA's dissent. I write separately to explain why the Court's resolution of the jurisdictional question, *ante*, at 5–14, lacks any foundation in the Constitution's text or our historical traditions. We have jurisdiction under 28 U. S. C. §1257 only if the Louisiana Supreme Court's decision implicates a federal right. That condition is satisfied, the Court holds, because the Constitution purportedly requires state and federal postconviction courts to give "retroactive effect" to new substantive constitutional rules by applying them to overturn long-final convictions and sentences. *Ante,* at 8. Because our Constitution and traditions embrace no such right, I respectfully dissent.

## I

"[O]ur jurisprudence concerning the 'retroactivity' of 'new rules' of constitutional law is primarily concerned, not with the question whether a constitutional violation occurred, but with the availability or nonavailability of remedies." *Danforth* v. *Minnesota,* 552 U. S. 264, 290–291 (2008). Accordingly, the issue in this case is not whether prisoners who received mandatory life-without-parole sentences for crimes they committed decades ago as juveniles had an Eighth Amendment right not to receive such a sentence. Rather, the question is how, when, and in

what forum that newfound right can be enforced. See *ibid.*

The Court answers that question one way: It says that state postconviction and federal habeas courts are constitutionally required to supply a remedy because a sentence or conviction predicated upon an unconstitutional law is a legal nullity. See *ante,* at 8–14. But nothing in the Constitution's text or in our constitutional tradition provides such a right to a remedy on collateral review.

## A

No provision of the Constitution supports the Court's holding. The Court invokes only the Supremacy Clause, asserting that the Clause deprives state and federal postconviction courts alike of power to leave an unconstitutional sentence in place. *Ante,* at 12–13. But that leaves the question of what provision of the Constitution supplies that underlying prohibition.

The Supremacy Clause does not do so. That Clause merely supplies a rule of decision: *If* a federal constitutional right exists, that right supersedes any contrary provisions of state law. See Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"). Accordingly, as we reaffirmed just last Term, the Supremacy Clause is no independent font of substantive rights. *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 3).

Nor am I aware of any other provision in the Constitution that would support the Court's new constitutional right to retroactivity. Of the natural places to look— Article III, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of

the Fourteenth Amendment—none establishes a right to void an unconstitutional sentence that has long been final.

To begin, Article III does not contain the requirement that the Court announces today. Article III vests "[t]he judicial Power" in this Court and whatever inferior courts Congress creates, Art. III, §1, and "extend[s]" that power to various "Cases . . . and Controversies," Art. III, §2. Article III thus defines the scope of *federal* judicial power. It cannot compel *state* postconviction courts to apply new substantive rules retroactively.

Even if the Court's holding were limited to federal courts, Article III would not justify it. The nature of "judicial power" may constrain the retroactivity rules that Article III courts can apply.* But even our broad modern precedents treat Article III as requiring courts to apply new rules only on *direct* review. Thus in *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), the Court suggested—based on Justice Harlan's views—that "after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review." *Id.*, at 322–323. But, as Justice Harlan had explained, that view of Article III has no force on collateral review: "While the entire theoretical underpinnings of judicial review and constitutional supremacy dictate that federal courts having jurisdiction on direct review adjudicate every issue of law . . . fairly implicated by the trial process below and properly presented on appeal, federal courts have never had a similar obligation on habeas corpus." *Mackey* v. *United States*, 401 U. S. 667, 682 (1971) (opinion concurring in judgment in part and dissenting in part).

————————

*For instance, Article III courts cannot arrive at a holding, refuse to apply it to the case at hand, and limit its application to future cases involving yet-to-occur events. The power to rule prospectively in this way is a quintessentially legislative power. See *Harper* v. *Virginia Dept. of Taxation*, 509 U. S. 86, 106–110 (1993) (SCALIA, J., concurring).

The Court's holding also cannot be grounded in the Due Process Clause's prohibition on "depriv[ations] . . . of life, liberty, or property, without due process of law." Amdts. V and XIV, §1.  Quite possibly, "'[d]ue process of law' was originally used as a shorthand expression for governmental proceedings according to the 'law of the land' *as it existed at the time of those proceedings.*"  *In re Winship*, 397 U. S. 358, 378 (1970) (Black, J., dissenting) (emphasis added); accord, *Johnson* v. *United States*, 576 U. S. ___, ___ (2015) (THOMAS, J., concurring in judgment) (slip op., at 17).  Under that understanding, due process excluded any right to have new substantive rules apply retroactively.

Even if due process required courts to anticipate this Court's new substantive rules, it would not compel courts to revisit settled convictions or sentences on collateral review.  We have never understood due process to require further proceedings once a trial ends.  The Clause "does not establish any right to an appeal . . . and certainly does not establish any right to collaterally attack a final judgment of conviction."  *United States* v. *MacCollom*, 426 U. S. 317, 323 (1976) (plurality opinion); see *Pennsylvania* v. *Finley*, 481 U. S. 551, 557 (1987) ("States have no obligation to provide [postconviction] relief").  Because the Constitution does not require postconviction remedies, it certainly does not require postconviction courts to revisit every potential type of error.  Cf. *Martinez* v. *Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U. S. 152, 165–166 (2000) (SCALIA, J., concurring in judgment) ("Since a State could . . . subject its trial-court determinations to no review whatever, it could *a fortiori* subject them to review which consists of a nonadversarial reexamination of convictions by a panel of government experts").

Nor can the Equal Protection Clause justify requiring courts on collateral review to apply new substantive rules retroactively.  That Clause prohibits a State from "de-

ny[ing] to any person within its jurisdiction the equal protection of the laws." Amdt. XIV, §1. But under our precedents "a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour* v. *Indianapolis,* 566 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 6) (internal quotation marks omitted; ellipsis in original).

The disparity the Court eliminates today—between prisoners whose cases were on direct review when this Court announced a new substantive constitutional rule, and those whose convictions had already become final—is one we have long considered rational. "[T]he notion that different standards should apply on direct and collateral review runs throughout our recent habeas jurisprudence." *Wright* v. *West*, 505 U. S. 277, 292 (1992); see *Brecht* v. *Abrahamson*, 507 U. S. 619, 633–635 (1993). Thus, our precedents recognize a right to counsel on direct review, but not in collateral proceedings. Compare *Douglas* v. *California*, 372 U. S. 353, 355–358 (1963) (courts must provide counsel on an initial direct appeal), with *Finley*, *supra*, at 555 (no such right on habeas). The Fourth Amendment also applies differently on direct and collateral review. Compare *Mapp* v. *Ohio*, 367 U. S. 643, 654–660 (1961) (courts on direct review must exclude evidence obtained in violation of the Fourth Amendment), with *Stone* v. *Powell*, 428 U. S. 465, 489–496 (1976) (no relitigation of such claims on collateral review).

These distinctions are reasonable. They reflect the "significant costs" of collateral review, including disruption of "the State's significant interest in repose for concluded litigation." *Wright, supra,* at 293 (internal quotation marks omitted). Our equal protection precedents, therefore, do not compel a uniform rule of retroactivity in direct and collateral proceedings for new substantive

constitutional rules.

## B

The Court's new constitutional right also finds no basis in the history of state and federal postconviction proceedings. Throughout our history, postconviction relief for alleged constitutional defects in a conviction or sentence was available as a matter of legislative grace, not constitutional command.

The Constitution mentions habeas relief only in the Suspension Clause, which specifies that "[t]he Privilege of the Writ of *Habeas Corpus* shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, §9, cl. 2. But that Clause does not specify the scope of the writ. And the First Congress, in prescribing federal habeas jurisdiction in the 1789 Judiciary Act, understood its scope to reflect "the black-letter principle of the common law that the writ was simply not available at all to one convicted of crime by a court of competent jurisdiction." Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 466 (1963). Early cases echoed that understanding. *E.g., Ex parte Watkins*, 3 Pet. 193, 202 (1830) ("An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous").

For nearly a century thereafter, this Court understood the Judiciary Act and successor provisions as limiting habeas relief to instances where the court that rendered the judgment lacked jurisdiction over the general category of offense or the person of the prisoner. See *Wright, supra*, at 285 (recounting history). Federal habeas courts thus afforded no remedy for a claim that a sentence or conviction was predicated on an unconstitutional law. Nor did States. Indeed, until 1836, Vermont made no provision for

any state habeas proceedings. See Oaks, Habeas Corpus in the States 1776–1865, 32 U. Chi. L. Rev. 243, 250 (1965). Even when States allowed collateral attacks in state court, review was unavailable if the judgment of conviction was rendered by a court with general jurisdiction over the subject matter and the defendant. *Id.,* at 261–262.

The Court portrays *Ex parte Siebold*, 100 U. S. 371 (1880), as a departure from this history and as the genesis of a constitutional principle that "a conviction obtained under an unconstitutional law warrants habeas relief." *Ante*, at 12. But *Siebold*—a case construing the scope of federal habeas review under the 1789 Judiciary Act—does not support the Court's position. *Ante,* at 7–8 (SCALIA, J., dissenting). *Siebold* did not imply that the Constitution requires courts to stop enforcing convictions under an unconstitutional law. Rather, *Siebold* assumed that prisoners would lack a remedy if the federal habeas statute did not allow challenges to such convictions. 100 U. S., at 377 ("It is true, if no writ of error lies, the judgment may be final, in the sense that there may be no means of reversing it").

Moreover, when Congress authorized appeals as a matter of right in federal criminal cases, the Court renounced *Siebold* and stopped entertaining federal habeas challenges to the constitutionality of the statute under which a defendant was sentenced or convicted. See Bator, *supra*, at 473–474, and n. 77. If the Constitution prevented courts from enforcing a void conviction or sentence even after the conviction is final, this Court would have been incapable of withdrawing relief.

The Court's purported constitutional right to retroactivity on collateral review has no grounding even in our modern precedents. In the 1950's, this Court began recognizing many new constitutional rights in criminal proceedings. Even then, however, the Court did not perceive any

constitutional right for prisoners to vacate their convic-
tions or sentences on collateral review based on the
Court's new interpretations of the Constitution. To the
contrary, the Court derived *Miranda* warnings and the
exclusionary rule from the Constitution, yet drew the line
at creating a constitutional right to retroactivity. *E.g.,
Linkletter* v. *Walker*, 381 U. S. 618, 629 (1965) ("[T]he
Constitution neither prohibits nor requires retrospective
effect. As Justice Cardozo said, 'We think the Federal
Constitution has no voice upon the subject'").

Only in 1987, in *Griffith* v. *Kentucky*, 479 U. S. 314, did
this Court change course and hold that the Constitution
requires courts to give constitutional rights some retroac-
tive effect. Even then, *Griffith* was a directive only to
courts on *direct* review. It held that "a new rule for the
conduct of criminal prosecutions is to be applied retroac-
tively to all cases, state or federal, pending on direct re-
view or not yet final." *Id.*, at 328. It said nothing about
what happens once a case becomes final. That was re-
solved in *Teague* v. *Lane*, 489 U. S. 288 (1989)—which
announced the narrow exceptions to the rule against
retroactivity on collateral review—but which did so by
interpreting the scope of the federal habeas writ, not the
Constitution.

## II
### A

Not only does the Court's novel constitutional right lack
any constitutional foundation; the reasoning the Court
uses to construct this right lacks any logical stopping
point. If, as the Court supposes, the Constitution bars
courts from insisting that prisoners remain in prison when
their convictions or sentences are later deemed unconsti-
tutional, why can courts let stand a judgment that wrongly
decided any constitutional question?

The Court confronted this question when *Siebold* and

other cases began expanding the federal habeas statute to
encompass claims that a sentence or conviction was con-
stitutionally void. But the Court could not find a satisfac-
tory answer: "A judgment may be erroneous and not void,
and it may be erroneous *because* it is void. The distinc-
tions . . . are very nice, and they may fall under the one
class or the other as they are regarded for different pur-
poses." *Ex parte Lange*, 18 Wall. 163, 175–176 (1874).

The lack of any limiting principle became apparent as
the Court construed the federal habeas statute to supply
jurisdiction to address prerequisites to a valid sentence or
conviction (like an indictment). See Bator, 76 Harv.
L. Rev., at 467–468, and n. 56, 471. As Justice Bradley,
*Siebold*'s author, later observed for the Court: "It is diffi-
cult to see why a conviction and punishment under an
unconstitutional law is more violative of a person's consti-
tutional rights, than an unconstitutional conviction and
punishment under a valid law." *In re Nielsen*, 131 U. S.
176, 183 (1889).

I doubt that today's rule will fare any better. By refash-
ioning *Siebold* as the foundation of a purported constitu-
tional right, the Court transforms an unworkable doctrine
into an immutable command. Because Justice Bradley's
dicta in *Siebold* was a gloss on the 1789 Judiciary Act,
Congress could at least supply a fix to it. But the Court's
reinvention of *Siebold* as a constitutional imperative
eliminates any room for legislative adjustment.

## B

There is one silver lining to today's ruling: States still
have a way to mitigate its impact on their court systems.
As the Court explains, States must enforce a constitutional
right to remedies on collateral review only if such pro-
ceedings are "open to a claim controlled by federal law."
*Ante,* at 13. State courts, on collateral review, thus must
provide remedies for claims under *Miller* v. *Alabama*, 567

U. S. \_\_\_ (2012), only if those courts are open to "claims that a decision of this Court has rendered certain sentences illegal . . . under the Eighth Amendment." See *ante*, at 13.

Unlike the rule the Court announces today, this limitation at least reflects a constitutional principle. Only when state courts have chosen to entertain a federal claim can the Supremacy Clause conceivably command a state court to apply federal law. As we explained last Term, private parties have no "constitutional . . . right to enforce federal laws against the States." *Armstrong*, 575 U. S., at \_\_\_ (slip op., at 4). Instead, the Constitution leaves the initial choice to entertain federal claims up to state courts, which are "tribunals over which the government of the Union has no adequate control, and which may be closed to any claim asserted under a law of the United States." *Osborn* v. *Bank of United States*, 9 Wheat. 738, 821 (1824).

States therefore have a modest path to lessen the burdens that today's decision will inflict on their courts. States can stop entertaining claims alleging that this Court's Eighth Amendment decisions invalidated a sentence, and leave federal habeas courts to shoulder the burden of adjudicating such claims in the first instance. Whatever the desirability of that choice, it is one the Constitution allows States to make.

\*　\*　\*

Today's decision repudiates established principles of finality. It finds no support in the Constitution's text, and cannot be reconciled with our Nation's tradition of considering the availability of postconviction remedies a matter about which the Constitution has nothing to say. I respectfully dissent.