Filed 2/23/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re KRISTOPHER KIRCHNER on Habeas Corpus. | D067920<br><br>(Super. Ct. Nos. HC21804, CRN 26291) |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge. Reversed with directions.

Bonnie M. Dumanis, District Attorney, James E. Atkins, Jennifer Kaplan and Craig E. Fisher, Deputy District Attorneys, for Appellant the People.

Randy Mize, Chief Deputy Public Defender, Abbey J. Noel and Troy Anthony Britt, Deputy Public Defenders, for Respondent Kristopher Kirchner.

The district attorney appeals the trial court's order granting Kristopher Kirchner's petition for habeas corpus. The trial court correctly concluded the holdings of *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*) and *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*) apply retroactively in state collateral proceedings such as the one presented here and that the Eighth Amendment of the United

States Constitution requires that when inmates, such as Kirchner, are serving life terms for crimes committed while they were juveniles, they must, except in the most extraordinary circumstances, be given an opportunity to seek parole. (See *Montgomery v. Lousiana* (2016) ___U.S.___ [135 S.Ct. 1546, 191 L.Ed.2d 635] (*Montgomery*).) However, where, as is the case in California, a legislature has provided inmates serving life sentences for crimes committed while they were juveniles with an opportunity to obtain a parole hearing, the state has remedied any constitutional defect in the inmate's sentence.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

On April 28, 1993, Kirchner, age 16 at the time, and Damien Miller, age 15, executed a plan to rob a gun store in Vista, California owned by Ross Elvey. Once inside the store, Kirchner repeatedly hit 59-year-old Elvey in the head with a metal pipe causing severe trauma that ultimately resulted in Elvey's death after languishing in a coma for 40 days. Leaving Elvey unconscious and bleeding, Kirchner and Miller took numerous weapons and fled on foot. The pair knocked on doors in a nearby residential neighborhood claiming they needed a ride to nearby San Marcos because they had been attacked by gang members. The minors convinced someone to drive them, but were quickly apprehended by sheriff's deputies searching the area.

---

[1] Our opinion is limited to inmates, who, like Kirchner, have been incarcerated for at least 15 years. We do not decide whether inmates whose incarceration is less than 15 years are entitled to an expedited recall and resentencing under Penal Code section 1170, subdivision (d)(2).

2

Kirchner was initially charged in juvenile court. After a hearing under Welfare and Institutions Code section 707, however, the court found Kirchner unfit to be prosecuted as a juvenile and he was charged as an adult. During trial, Kirchner brought a motion to strike the People's special circumstance allegation under Penal Code section 190.2, subdivision (a)(17) that he committed the murder while engaged in the commission of a robbery and burglary. Kirchner argued the imposition of the sentence of life without the possibility of parole (LWOP) that he faced under Penal Code section 190.5 as a result of the special circumstance allegation would constitute a violation of the Eighth Amendment to the United States Constitution. The district attorney responded that since a sentence of death for a 16- or 17-year-old was constitutionally permissible, there was no question the LWOP sentence Kirchner faced was also permissible. The trial court agreed with the prosecutor and denied Kirchner's motion.

After a court trial, on March 10, 1994, Kirchner was found guilty of one count of first degree murder (Pen. Code, § 187, subd. (a)). The court found true the special circumstance allegation that Kirchner committed the murder while engaged in the commission of a robbery and burglary (Pen. Code, § 190.2, subd. (a)(17)(A), (G)) and that Kirchner personally used a deadly or dangerous weapon during the commission of the murder (Pen. Code, § 12022, subd. (b)). Kirchner was also convicted of one count of robbery (Pen. Code, § 211) and one count of burglary (Pen. Code, § 459), with allegations as to each offense that Kirchner personally inflicted great bodily injury (Pen. Code, § 12022.7) and personally used a deadly or dangerous weapon (Pen. Code, § 12022, subd. (b)). Kirchner was remanded to the California Youth Authority (CYA)

3

pursuant to Welfare and Institutions Code section 707.2 in order to determine his amenability to the training and treatment offered by that agency. The CYA concluded there was a reasonable probability that Kirchner's likelihood to commit further crimes could be reduced or eliminated within the available confinement time if sentenced as a juvenile.

The trial court declined to follow the recommendation of the CYA and, on September 15, 1994, sentenced Kirchner to LWOP on the murder conviction, plus one year consecutive for the weapon enhancement. The court stayed sentencing on the remaining counts and attendant allegations under Penal Code section 654. Kirchner appealed, but the appeal was dismissed after he failed to file an opening brief and his sentence became final. In 2013, after *Miller* was decided, Kirchner filed a petition for writ of habeas corpus challenging the LWOP sentence. The trial court denied the petition but noted the issues raised by Kirchner were then pending before the California Supreme Court in *Gutierrez*.

Kirchner filed a second petition for writ of habeas corpus in October 2014 contending that under *Miller* and *Gutierrez* his sentence violated the Eighth Amendment. The superior court issued an order to show cause asking why relief should not be granted and stated that the record showed the "trial court did not engage in the youth oriented analysis required" under *Miller* and *Gutierrez*. The district attorney's initial return conceded Kirchner was entitled to a new sentencing hearing for the court to consider whether the imposition of the LWOP sentence was appropriate.

Before the superior court issued a ruling, however, the district attorney filed an application for permission to file a supplemental return. In the supplemental return, the district attorney reversed course. The return argued *Miller* and *Gutierrez* could not be applied retroactively and Kirchner was, therefore, barred from collaterally attacking his sentence. The court granted the request to file a supplemental return. Kirchner filed a supplemental denial. On March 27, 2015, the superior court granted Kirchner's petition. The district attorney filed a timely notice of appeal.

DISCUSSION

I

In *Miller*, the United States Supreme Court held "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' "[2] (*Miller*, *supra*, 132 S.Ct. at p. 2460.) *Miller* explained the Supreme Court's prior cases had "establish[ed] that children are constitutionally different from adults for purposes of sentencing." (*Id.* at p. 2464.) Summarizing its holding, the court stated: "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It

---

[2] *Miller* decided two companion cases, both involving petitioners who were 14 at the time they committed homicides that resulted in sentences of LWOP. Petitioner Evan Miller's case arose on direct appeal, and Kuntrell Jackson's case arose on appeal from a petition for writ of habeas corpus. (*Miller*, *supra*, 132 S.Ct. at pp. 2461-2463.)

5

neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id*. at p. 2468.)

*Miller* looked to two lines of precedent to support its holding. The first holds the Eighth Amendment's bar against cruel and unusual punishment bans sentencing practices that result in a divergence between the culpability of a class of offenders and the severity of the penalty imposed. (*Miller*, *supra*, 132 S.Ct. 2544, citing *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) [holding unconstitutional a sentence of life imprisonment without parole for a minor who committed a nonhomicide offense]; *Atkins v. Virginia* (2002) 536 U.S. 304 [holding the execution of intellectually disabled defendants unconstitutional]; *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*) [holding the execution of individuals who were under 18 years of age at the time of their capital crimes unconstitutional]; *Kennedy v. Louisiana* (2008) 554 U.S. 407 [holding unconstitutional the death penalty for nonhomicide offenses].)

These cases "evok[e] a second line of . . . precedents . . . prohibit[ing] mandatory imposition of capital punishment" and instead "require[e] that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing

6

him to death." (*Miller*, *supra*, 132 S.Ct. at pp. 2463-2464, citing *Woodson v. North Carolina* (1976) 428 U.S. 280 (plur. opn.) and *Lockett v. Ohio* (1978) 438 U.S. 586.) *Miller* looked to these two lines of precedents, as well as advances in the science of children's brains and behavior, to conclude "juveniles have diminished culpability and greater prospects for reform" and, therefore, are " 'less deserving of the most severe punishments.' " (*Miller*, at p. 2464.)

In *Gutierrez*, the California Supreme Court addressed the impact of *Miller* on Penal Code[3] section 190.5, subdivision (b), enacted in 1990 to permit the imposition of LWOP sentences on 16- and 17-year-old offenders in California in certain circumstances. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1371-1372.)  Section 190.5, subdivision (b), which authorized Kirchner's LWOP sentence, provides in relevant part:  "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."  (§ 190.5, subd. (b).)

*Gutierrez* stated that since the pronouncement in *People v. Guinn* (1994) 28 Cal.App.4th 1130 (*Guinn*), "Courts of Appeal have uniformly interpreted section 190.5[, subdivision] (b) as establishing a presumption in favor of life without parole for juvenile offenders who were 16 years of age or older when they committed special circumstance

---

3      All further statutory references are to the Penal Code unless otherwise indicated.

murder." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1369.) *Gutierrez* concluded *Guinn*'s interpretation of the statute to create a presumption in favor of LWOP "was inconsistent with the principles set forth in *Miller*. ' "Treating [life without parole] as the default sentence takes the premise in *Miller* that such sentences should be rarities and turns that premise on its head, instead placing the burden on a youthful defendant to affirmatively demonstrate that he or she deserves an opportunity for parole." ' " (*People v. Chavez* (2014) 228 Cal.App.4th 18, 31 (*Chavez*), quoting *Gutierrez*, at p. 1379.)

*Gutierrez* "further held that in considering whether to impose a life sentence without possibility of parole, a sentencing court must consider the five factors enumerated in *Miller*: (1) the inherent impact of the juvenile's age on his culpability; (2) the juvenile's home and family environment; (3) the circumstances of the homicide offense; (4) the juvenile's ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) the possibility of rehabilitation." (*Chavez*, *supra*, 228 Cal.App.4th at p. 32, citing *Gutierrez*, *supra*, 58 Cal.4th at pp. 1389-1390.).) *Gutierrez*, which decided two companion cases both arising on direct appeal, presumed that the trial courts had followed the law as interpreted by *Guinn* and its progeny and "therefore erroneously treated a sentence of life without possibility of parole as *required* by section 190.5, unless good reason to impose the less severe option of 25 years to life existed." (*Chavez*, at p. 32, italics added.)

*Gutierrez* concluded the presumed error required remand for resentencing because the records before it did "not clearly indicate that [the trial courts] would have imposed the same sentence had they been aware of the full scope of their discretion." (*Gutierrez*,

8

*supra*, 58 Cal.4th at p. 1391.)  "Because the trial courts operated under a governing presumption in favor of life without parole, we cannot say with confidence what sentence they would have imposed absent the presumption. . . .  [¶]  . . . The question is whether each [defendant] can be deemed, at the time of sentencing, to be irreparably corrupt, beyond redemption, and thus unfit ever to reenter society, notwithstanding the 'diminished culpability and greater prospects for reform' that ordinarily distinguish juveniles from adults.  [Citation.]"[4]  (*Ibid.*)

Finally, as we discuss more fully in part III, *Gutierrez* rejected the Attorney General's contention that the LWOP sentence the court was reviewing on direct appeal had been remedied by the Legislature's enactment of section 1170, subdivision (d)(2).  (*Gutierrez, supra*, 58 Cal.4th at p. 1386.)

II

The principal issue we consider here is whether the rule announced in *Miller* must be applied retroactively in a collateral proceeding.  The issue was quite recently, and definitively, resolved by the court's opinion in *Montgomery*, which held that *Miller* must be given retroactive application.

---

4    Kirchner was sentenced weeks before *Guinn* announced that "Penal Code section 190.5 means . . . that 16- or 17-year-olds who commit special circumstance murder *must* be sentenced to LWOP, *unless* the court, in its discretion, finds good reason to choose the less severe sentence of 25 years to life." (*Guinn, supra*, 28 Cal.App.4th at p. 1141.)  The district attorney, however, does not argue that the sentencing court properly exercised its discretion under 190.5 in imposing the LWOP sentence, rather than improperly applying a presumption in favor of LWOP.

9

The petitioner in *Montgomery* was 17 years old in 1963 when he killed a police officer. Although initially sentenced to death, his initial conviction was reversed, and, on retrial, he was given an automatic LWOP sentence. Following *Miller*, he filed a petition for habeas corpus relief in state court in Louisiana and was denied any relief.

The petitioner asserted *Miller* provided a substantive federal constitutional limitation on the state's sentencing power, rather than a procedural one. He argued the United States Supreme Court had federal question jurisdiction over his contention as to the nature of the rights recognized in *Miller* and that, given their substantive character, state courts should be required to apply *Miller* retroactively. The court agreed both that the petition presented a federal question and that *Miller* was a substantive limitation on the state's sentencing powers. The court found that under the court's prior holdings in *Teague v. Lane* (1989) 489 U.S. 288 (*Teague*), *Schriro v. Summerlin* (2004) 542 U.S. 348, 352 and *Penry v. Lynaugh* (1989) 492 U.S. 302, *Miller*'s substantive, as opposed to procedural, character in turn required that *Miller* be given retroactive effect.[5] (*Montgomery*, *supra*, 193 L.Ed.2d at p. 609.)

---

[5] In *Teague*, the United States Supreme Court held "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," unless the rule falls within one of two narrow categories of exception. (*Teague*, *supra*, 489 U.S. at p. 310.) The court explained new rules are generally not applied retroactively to cases on collateral review because the function of habeas corpus is limited. " '[T]he Court never has defined the scope of the writ simply by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error.' " (*Id*. at p. 308.) "Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." (*Id*. at p. 309.)

In explaining the need for retroactive application of new substantive constitutional rules, as opposed to procedural ones, the *Montgomery* court stated: "Substantive rules . . . set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose. It follows that when a State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful. Procedural rules, in contrast, are designed to enhance the accuracy of a conviction or sentence by regulating 'the *manner of determining* the defendant's culpability.' [Citations.] Those rules 'merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.' [Citation.] Even where procedural error has infected a trial, the resulting conviction or sentence may still be accurate; and, by extension, the defendant's continued confinement may still be lawful. For this reason, a trial conducted under a procedure found to be unconstitutional in a later case does not, as a general matter, have the automatic consequence of invalidating a defendant's conviction or sentence.

"The same possibility of a valid result does not exist where a substantive rule has eliminated a State's power to proscribe the defendant's conduct or impose a given punishment. '[E]ven the use of impeccable factfinding procedures could not legitimate a verdict' where 'the conduct being penalized is constitutionally immune from punishment.'

*Teague* nonetheless identified two categories of exception to this bar: "First, a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.' [Citation.] Second, a new rule should be applied retroactively if it requires the observance of 'those procedures that . . . are "implicit in the concept of ordered liberty." ' " (*Teague*, *supra*, 489 U.S. at p. 307.)

11

[Citation.] Nor could the use of flawless sentencing procedures legitimate a punishment where the Constitution immunizes the defendant from the sentence imposed. 'No circumstances call more for the invocation of a rule of complete retroactivity.' [Citation.]" (*Montgomery*, *supra*, 193 L.Ed.2d at p. 615.)

In determining that *Miller* was a substantive limitation on state sentencing powers, the *Montgomery* court emphasized the narrow number of instances in which imposing an LWOP sentence on a juvenile will be permissible under the Eighth Amendment: "*Miller*, it is true, did not bar a punishment for all juvenile offenders, as the Court did in *Roper* or *Graham*. *Miller* did bar life without parole, however, *for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility*. For that reason, *Miller* is no less substantive than are *Roper* and *Graham*. Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole. After *Miller*, *it will be the rare juvenile offender who can receive that same sentence*. The only difference between *Roper* and *Graham*, on the one hand, and *Miller*, on the other hand, is that *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption. The fact that life without parole could be a proportionate sentence for the latter kind of juvenile offender does not mean that all other children imprisoned under a disproportionate sentence have not suffered the deprivation of a substantive right." (*Montgomery*, *supra*, 193 L.Ed.2d at p. 620, italics added.)

Thus, the court held the procedural limitations *Miller* imposed when courts sentence juveniles did not deprive the constitutional interests recognized in *Miller* of their

12

substantive nature. "To be sure, *Miller*'s holding has a procedural component. *Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence. [Citation.] Louisiana contends that because *Miller* requires this process, it must have set forth a procedural rule. This argument, however, conflates a procedural requirement necessary to implement a substantive guarantee with a rule that 'regulate[s] only the *manner of determining* the defendant's culpability.' [Citation.] There are instances in which a substantive change in the law must be attended by a procedure that enables a prisoner to show that he falls within the category of persons whom the law may no longer punish. [Citation.] For example, when an element of a criminal offense is deemed unconstitutional, a prisoner convicted under that offense receives a new trial where the government must prove the prisoner's conduct still fits within the modified definition of the crime. In a similar vein, when the Constitution prohibits a particular form of punishment for a class of persons, an affected prisoner receives a procedure through which he can show that he belongs to the protected class. [Citation.] Those procedural requirements do not, of course, transform substantive rules into procedural ones.

"The procedure *Miller* prescribes is no different. A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. [Citation.] The hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." (*Montgomery*, *supra*, 193 L.Ed.2d at pp. 620-621.)

13

In light of the holding in *Montgomery*, inmates such as Kirchner, who are serving LWOP sentences for crimes they committed while they were juveniles, are plainly entitled to the benefits of *Miller*, even though their judgments of conviction are final.

III

A. Remedies Available in Collateral Proceedings

The court's majority opinion in *Montgomery* was subject to a vigorous dissent, in which among other matters Justice Scalia pointed out the practical burden state courts will face in attempting to resentence juveniles who committed crimes long before they are given habeas relief under the court's holding. Justice Scalia stated: "Federal and (like it or not) state judges are henceforth to resolve the knotty 'legal' question: whether a 17-year-old who murdered an innocent sheriff's deputy half a century ago was at the time of his trial 'incorrigble.' Under *Miller*, bear in mind, the inquiry is whether the inmate was seen to be incorrigible when he was sentenced—not whether he has proven corrigible and so can safely be paroled today. What silliness. (And how impossible in practice, see Brief for National District Attorneys Assn. et al. as *Amici Curiae* 9-17.)" (*Montgomery*, *supra*, 193 L.Ed.2d at p. 631 (dis. opn. of Scalia, J.).)

In apparent response to Justice Scalia's concerns, in addition to finding that *Miller* sets forth substantive limitations, rather than wholly procedural ones, the court in *Montgomery* also prescribed alternative remedies states may provide to inmates serving LWOP sentences imposed for crimes committed while they were juveniles, when, as here, their judgments of conviction are final: "Giving *Miller* retroactive effect, moreover, does not require States to relitigate sentences, let alone convictions, in every case where a

14

juvenile offender received mandatory life without parole.  A State may remedy a *Miller* violation *by permitting juvenile homicide offenders to be considered for parole*, rather than by resentencing them.  [Citation.][6]  Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—*and who have since matured*—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment."  (*Montgomery*, *supra*, 193 L.Ed.2d at p. 622, italics added.)

In expressly providing that a state need not relitigate sentences, but may instead simply permit defendants such as Kirchner "to be considered for parole," the court in *Montgomery* made it unambiguously clear that, in collateral proceedings, a defendant's release may, under the Constitution, depend in part at least on his postconviction behavior.  Indeed, in explaining that the opportunity for parole is sufficient to satisfy the Eighth Amendment, the court stated:  "Those prisoners who have shown an inability to reform will continue to serve life sentences.  The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who

---

6      In creating this alternative remedy, the court cited, as an example, a Wyoming statute (Wyo. Stat. Ann § 6-10-301(c) (2013)), which makes juvenile offenders eligible for parole after 25 years so long as they have not committed an assault on a prison employee or attempted to escape. (*Montgomery*, *supra*, 193 L.Ed.2d at p. 622.)  The Wyoming statute is somewhat similar to our own section 3051, which provides for juvenile parole hearings for prisoners sentenced to either determinate sentences or life sentences with the possibility of parole.  As we explain, LWOP sentences imposed on juveniles are governed by section 1170, subdivision (d)(2), which permits a prisoner to apply for a recall and resentencing after serving 15 years of his or her sentence.  We do not believe the court's citation to the Wyoming statute excluded alternative remedies such as section 1170, subdivision (d)(2), which, like the Wyoming statute and section 3051, avoid the practical problem of attempting to determine retroactively whether a defendant was incorrigible at the time of his or her initial sentence.

commit even heinous crimes are capable of change." (*Montgomery*, *supra*, 193 L.Ed.2d at p. 622.) Thus, following *Montgomery*, in collateral proceedings all that is required is either resentencing in compliance with *Miller* or a process by which the defendant is given a fair opportunity to be considered for parole.

In an order permitting the parties to provide supplemental briefing with respect to *Montgomery*, we brought the foregoing passage from *Montgomery*, as well as section 1170, subdivision (d)(2) to the parties' attention.

B.  Section 1170, subdivision (d)(2)

In general and with exceptions not pertinent here, section 1170, subdivision (d)(2)[7] permits an inmate serving an LWOP sentence for a crime committed while he or

---

[7]     Section 1170, subdivision (d)(2) provides:
"(A)(i) When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has served at least 15 years of that sentence, the defendant may submit to the sentencing court a petition for recall and resentencing.
"(ii) Notwithstanding clause (i), this paragraph shall not apply to defendants sentenced to life without parole for an offense where the defendant tortured, as described in Section 206, his or her victim or the victim was a public safety official, including any law enforcement personnel mentioned in Chapter 4.5 (commencing with Section 830) of Title 3, or any firefighter as described in Section 245.1, as well as any other officer in any segment of law enforcement who is employed by the federal government, the state, or any of its political subdivisions.
"(B) The defendant shall file the original petition with the sentencing court.  A copy of the petition shall be served on the agency that prosecuted the case.  The petition shall include the defendant's statement that he or she was under 18 years of age at the time of the crime and was sentenced to life in prison without the possibility of parole, the defendant's statement describing his or her remorse and work towards rehabilitation, and the defendant's statement that one of the following is true:
"(i) The defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law.

16

"(ii) The defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the sentence is being considered for recall.

"(iii) The defendant committed the offense with at least one adult codefendant.

"(iv) The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse.

"(C) If any of the information required in subparagraph (B) is missing from the petition, or if proof of service on the prosecuting agency is not provided, the court shall return the petition to the defendant and advise the defendant that the matter cannot be considered without the missing information.

"(D) A reply to the petition, if any, shall be filed with the court within 60 days of the date on which the prosecuting agency was served with the petition, unless a continuance is granted for good cause.

"(E) If the court finds by a preponderance of the evidence that the statements in the petition are true, the court shall hold a hearing to consider whether to recall the sentence and commitment previously ordered and to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence. Victims, or victim family members if the victim is deceased, shall retain the rights to participate in the hearing.

"(F) The factors that the court may consider when determining whether to recall and resentence include, but are not limited to, the following:

"(i) The defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law.

"(ii) The defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the sentence is being considered for recall.

"(iii) The defendant committed the offense with at least one adult codefendant.

"(iv) Prior to the offense for which the sentence is being considered for recall, the defendant had insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress.

"(v) The defendant suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense.

"(vi) The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse.

17

she was a juvenile, to file a petition in the sentencing court for recall and resentencing after serving 15 years of the LWOP sentence. (§ 1170, subd. (d)(2)(A)(i).) The petition must be supported by a statement from the inmate that one of four enumerated circumstances is true, and the court must hold a hearing on the petition if it determines by a preponderance of the evidence that the petitioner's statement is true. At the hearing, based on eight criteria set forth in the statute or any other criteria identified by the sentencing court as relevant, the court may recall the sentence and resentence the inmate as if the inmate had not been previously sentenced. (§ 1170, subd. (d)(2)(G).) If the petition is not granted, the inmate may petition again for recall and resentencing after serving 20 years and again after serving 24 years. (§ 1170, subd. (d)(2)(H).)

---

"(vii) The defendant has maintained family ties or connections with others through letter writing, calls, or visits, or has eliminated contact with individuals outside of prison who are currently involved with crime.

"(viii) The defendant has had no disciplinary actions for violent activities in the last five years in which the defendant was determined to be the aggressor.

"(G) The court shall have the discretion to recall the sentence and commitment previously ordered and to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence. The discretion of the court shall be exercised in consideration of the criteria in subparagraph (B). Victims, or victim family members if the victim is deceased, shall be notified of the resentencing hearing and shall retain their rights to participate in the hearing.

"(H) If the sentence is not recalled, the defendant may submit another petition for recall and resentencing to the sentencing court when the defendant has been committed to the custody of the department for at least 20 years. If recall and resentencing is not granted under that petition, the defendant may file another petition after having served 24 years. The final petition may be submitted, and the response to that petition shall be determined, during the 25th year of the defendant's sentence.

"(I) In addition to the criteria in subparagraph (F), the court may consider any other criteria that the court deems relevant to its decision, so long as the court identifies them on the record, provides a statement of reasons for adopting them, and states why the defendant does or does not satisfy the criteria.

"(J) This subdivision shall have retroactive application."

18

The eight criteria for recall listed in the statute are factors related to: the nature of the defendant's participation in the underlying offense (§ 1170, subd. (F)(i) & (iii)); the defendant's previous criminal record, if any (§ 1170, subd. (F)(ii)); the defendant's psychological and social history at the time of the underlying offense (§ 1170, subd. (F)(iv) & (v)); and the defendant's conduct while incarcerated (§ 1170, subd. (F)(vi), (vii) & (viii)).  In particular, the defendant may show that he or she has "performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse."  (§ 1170, subd. (F)(vi).)

C.  Adequate Remedy

Where a habeas petitioner has an adequate remedy at law, he or she must employ it before seeking writ relief.  (*In re Gandolfo* (1984) 36 Cal.3d 889, 899-900; see *In re Robbins* (1998) 18 Cal.4th 770, 777 ["habeas corpus is an extraordinary remedy that 'was not created for the purpose of defeating or embarrassing justice, but to promote it' "].)  Thus, we must determine whether, in light of *Montgomery*, section 1170, subdivision (d)(2) is an adequate remedy which Kirchner was required to pursue before seeking habeas relief.

It is important to recognize that, although section 1170, subdivision (d)(2) does *not* provide an inmate with a parole hearing, it provides him or her with all the rights set forth in *Miller* and *Montgomery*.  As we have discussed, the statute establishes that when a

19

defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has served at least 15 years of that sentence, the defendant may submit to the sentencing court *a petition for recall and resentencing.* In determining whether recall and resentencing is warranted, the sentencing court will examine not just the factors existing at the time of the crime, that is, those factors related to the defendant's status as a juvenile, but also the factors relating to the defendant's postconviction conduct and rehabilitation.

This procedure of course responds to and remedies Justice Scalia's concerns, which are implicitly recognized by the majority in *Montgomery*, that, after perhaps decades in prison, a defendant cannot logically or in fairness be returned to the same status as existed on the day of sentencing. Under section 1170, subdivision (d)(2), a defendant who has committed a heinous crime but, in the aftermath, has matured and exhibited remorse and rehabilitation will be given not just the benefit of worthy conduct, but also judicial recognition of his or her inherent ability to reform. Likewise, upon the People's proper showing, a defendant who has committed a heinous crime and, in the aftermath, has continued a life of additional heinous acts, may continue to be separated from society, as expressly permitted by the court in *Montgomery*.

The state has obvious and legitimate interests in requiring a petition under section 1170, subdivision (d)(2), as opposed to either simple resentencing or providing an unconditional right to parole to all inmates serving LWOP sentences imposed for crimes committed while they were juveniles. Not only does the section 1170, subdivision (d)(2)

20

process of recall and resentencing provide an inmate with his or her *Miller* rights, it provides the state with a mechanism for uniform application of those rights.

Were we to find that section 1170, subdivision (d)(2) was not an adequate remedy at law and, thus, not a petitioner's exclusive remedy, we would permit a petitioner to *select* whether to take advantage of section 1170, subdivision (d)(2) *or* seek a direct resentencing limited to those factors existing at the time of the original sentencing. Arguably, in the absence of mandatory resort to section 1170, subdivision (d)(2), a defendant whose postconviction conduct would not warrant an opportunity for parole would nonetheless be entitled to a new sentence upon a showing that at the time of his or her original sentencing there had been no proof of his or her incorrigibility.

This case presents an example of the mischief possible if a defendant is left to select whether or not to use the statutory recall of sentence procedure. Kirchner has served some 22 years in prison. It is clear that he is eligible for recall and resentencing according to the provisions of section 1170, subdivision (d)(2). At oral argument, we asked why he has not availed himself of that statute's recall and resentencing process. Counsel candidly admitted selection of the process depends on the defendant. Counsel also indicated to the court that when seeking resentencing in trial courts, some courts have allowed resentencing based only upon circumstances exiting at the time of resentencing and some have allowed evidence of all postconviction conduct, maturity and rehabilitation. Such a system lacks uniformity and internal integrity.

It must be emphasized that *Miller* and *Montgomery* do not hold, and Kirchner does not contend, that a sentence of prison for life without the possibility of parole is in all

21

instances unlawful. The LWOP sentence of a juvenile is unconstitutional only when the trial judge has imposed it without meeting the procedural requirements of *Miller*. However, *Montgomery* does not preclude a procedure, such as set forth in section 1170, subdivision (d)(2), under which both a defendant's interests and the state's are fully examined and vindicated and where, as here, a defendant is seeking release after decades of incarceration.

It bears emphasizing, however, that where a prisoner is serving an LWOP sentence for a crime committed while he or she was a juvenile, and at the time of his or her sentence the trial judge failed to employ the procedures required by *Miller*, his or her sentence is *presumptively* unlawful and he or she is entitled to relief from it. (*Montgomery*, *supra*, 193 L.Ed.2d at pp. 620-622.) As we have noted, under *Montgomery* he or she must be given either a statutory right to apply for parole or a hearing in which the People establish that he or she falls within the narrow category of incorrigible criminals for whom an LWOP sentence is not disproportionate. Because an LWOP sentence is presumptively unlawful when the underlying crime was committed while an inmate was a juvenile and because *Miller* and *Montgomery* repeatedly state that courts will only rarely be able to find that a juvenile criminal is so incorrigible that he or she may never be considered for release, a petition under section 1170, subdivision (d)(2) will meet the requirements of *Miller* and *Montgomery*, only if, at both the trial court's review of the sufficiency of the petition (see § 1170, subd. (d)(2)(E)) and at any hearing ordered thereafter, the People bear the burden, as they would at any initial sentencing under *Miller* and *Gutierrez*, of showing that the defendant is one of the rare individuals

22

for whom no possibility of parole should be provided. A process in which an *inmate* serving an unlawful sentence was required to show that he or she was *not* one of the rare incorrigible criminals would ignore the mandate of *Montgomery* that *Miller* be given retroactive effect, as well as creating a presumption in favor or LWOP akin to the one rejected by the court in *Gutierrez*.

In sum then, under the circumstances we have described, and in particular given the requirement that the People bear the burden of proof at all stages of a section 1170, subdivision (d)(2) petition, the statute meets the requirements of *Miller* and *Montgomery* and is therefore an adequate remedy which Kirchner must pursue before resorting to habeas relief.

D. *Gutierrez*

Our conclusion the remedy provided by section 1170, subdivision (d)(2) meets the requirements of *Montgomery*, does not conflict with the holding in *Gutierrez*. *Gutierrez* was considered by the court on the direct appeals of two defendants from LWOP sentences imposed by separate trial courts. After sentence was imposed in each case and while the defendants' appeals were pending in the Court of Appeal, *Miller* was decided. In discussing the Attorney General's argument that any defect in the defendants' sentences under *Miller* had been cured by enactment of section 1170, subdivision (d)(2), the court noted that at the time a juvenile is sentenced to a life term without the possibility of parole, the sentence is, except in rare circumstances, disproportionate because it ignores the possibility of future rehabilitation and maturation. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1386-1387.) The court found that the possibility that an LWOP

23

sentence would later be recalled and a new sentence imposed under section 1170, subdivision (d)(2) did not cure the defect in the original sentence. (*Gutierrez*, at pp. 1386-1387.) In reaching this conclusion on appeal, the court in *Gutierrez* cited the following from the Supreme Court's earlier opinion in *Graham*, *supra*, 560 U.S. at page 73, also a direct appeal, in which the court held that it was unconstitutional to impose LWOP's on juveniles who had not committed a homicide offense: "Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior of failure to mature, the sentence was still disproportionate because that judgment was made *at the outset*." (*Ibid.*, italics added; see *Gutierrez,* at pp. 1386-1387.)

There is no conflict between the strictly prospective focus of the courts in *Gutierrez* and *Graham* and the retrospective focus expressly permitted by the court in *Montgomery*. Where, as in *Gutierrez* and *Graham*, the court was directly reviewing the legality of a sentence, its focus was properly prospective and on the requirements of the constitution when a sentencing judge is making a prospective sentencing decision. In contrast, in *Montgomery*, the court was considering the somewhat broader question of the constitutionality of the prisoner's *continued* confinement. (*Montgomery*, *supra*, 193 L.Ed.2d at p. 622) [*Miller* must be retroactive because of "grave risk that many are being held in violation of the Constitution"].) In that procedural context, it is quite reasonable to permit consideration of a defendant's postconviction conduct, especially in light of the possibility that a defendant's postconviction behavior might show that he or she falls within the very narrow category of incorrigible.

24

DISPOSITION

The trial court's order granting Kirchner's petition is reversed with directions that the trial court enter an order denying the petition without prejudice to Kirchner's right to bring a petition under section 1170, subdivision (d)(2).


BENKE, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.